IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO.:

6:12-cv-35-Orl-18GJK

DAVID A. SIEGEL, an individual;
and WESTGATE RESORTS, LTD.
a Florida limited partnership

    Plaintiffs,

v.

SUNDANCE INSTITUTE, INC., a not for profit
corporation; LAUREN GREENFIELD, an individual
FRANK EVERS, an individual

    Defendants.
_____/

## COMPLAINT

Plaintiffs David A. Siegel (hereinafter "Siegel") and Westgate Resorts, Ltd., a Florida limited partnership (hereinafter "Westgate") through its undersigned attorneys, sues Defendants, Sundance Institute, Inc., a Utah not for profit corporation (hereinafter "Sundance"); Lauren Greenfield, an individual (hereinafter "Greenfield"); and Frank Evers, an individual (hereinafter "Evers") and state as follows:

### JURISDICTION AND VENUE

1. This is an action for damages in excess of $75,000.00, exclusive of costs and in equity and is within the jurisdictional limits of this Court.

2. This court has jurisdiction over the claims under 28 U.S.C. §1332 because the amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs and because the parties have diversity of citizenship.

1

3. Venue is proper in the Middle District of Florida Pursuant to 28 U.S.C. §1391, because as set forth below, the events giving rise to Plaintiff's claims occurred in Orange County, Florida and because Defendants purposefully availed themselves of the Internet's distribution network in Orange County, Florida so as to be subject to the personal jurisdiction of the Middle District of Florida.

## PARTIES

4. At all material times, Siegel is and was a resident and citizen of Orange County, Florida.

5. Westgate is a limited partnership formed under and pursuant to the laws of Florida with its principal place of business in Orange County, Florida

6. Sundance is a not for profit corporation incorporated under and pursuant to the laws of Utah with its principal place of business in Summit county, Utah.

7. Greenfield is an individual believed to reside in Los Angeles County, California and is, accordingly, a citizen of the state of California.

8. Evers is an individual believed to reside in Los Angeles County, California, and is, accordingly, a citizen of the state of California.

9. All conditions precedent to the maintenance to the cause of action set forth herein have occurred, been waived or excused.

## GENERAL AND FACTUAL ALLEGATIONS

10. Siegel is the president and CEO of Westgate, a privately held timeshare and development company that owns and operates 27 resorts around the country.

11. Notably, Westgate owns a ski resort in Park City, Utah which does the bulk of its business during the winter ski season each year.

12. Siegel is so financially intertwined with his company Westgate such that Siegel's financial reputation is synonymous with Westgate's financial reputation and the two cannot be separated.

13. Westgate was thriving as of 2008 before Lehman Brothers collapsed and the global economic crisis began.

14. As an unfortunate result of the Lehman Brothers collapse which reverberated throughout the world financial markets, the credit and capital markets froze and Westgate's access to financing – until that time freely available to Westgate – was unforeseeably restricted. Notwithstanding the economic difficulties plaguing the nation, and although the timeshare industry was dramatically affected by these adverse financial conditions, Westgate's sales remained strong.

15. During this same time frame, Westgate had undertaken to construct its largest resort: the Planet Hollywood Towers by Westgate (the "Towers") on the "Strip" in Las Vegas, Nevada. Siegel had also commenced construction of his personal home in Orlando, Florida, which was thereafter commonly referred to as "Versailles".

16. Following their commitment to these projects, Westgate and Siegel suffered, as did all of the real estate segment of the U.S. economy, from the fundamental change in market conditions, including especially, the sudden unavailability of credit. Like many companies, Westgate was required to adjust to the economic conditions. This meant cutting costs and implementing efficiency measures within the company.

17. Construction was stopped on Versailles and instead of using revenues generated by the company and continuing to build Versailles, Siegel decided to dedicate all of his available

funds and efforts to Westgate. Because of, in substantial part, these efforts, Westgate weathered the financial storm so that it has been able to take advantage of improving market conditions.

18. As a key part of its plans, on November 21, 2011, Westgate sold its interest in the Towers and successfully restructured its debt.

19. Currently, Westgate is a stable and profitable company and Siegel continues to own Versailles.

## The Film and Sundance

20. In or around August, 2007, Greenfield approached Siegel and asked him whether or not he would be interested in being a subject for a documentary film to be produced by Greenfield (the "Film").

21. Greenfield expressed to Siegel that the Film would center around the construction of Versailles.

22. Siegel agreed to permit Greenfield to shoot footage for the Film, primarily in Orange County, Florida.

23. Ultimately, the Film was completed around four (4) years later.

24. Throughout the four (4) year filming process, Siegel continuously provided Greenfield and her Film crew with rooms at his various resorts throughout country, and even accommodated Greenfield and her Film crew at his personal home.

25. Since 2009, Siegel provided Greenfield and her Film crew with approximately 165 room nights at Siegel's resorts, as depicted on the breakdown attached hereto as **Exhibit "A"**.

26. The last time Greenfield and her Film crew visited Siegel in his personal home and stayed at Siegel's resorts was from November 26, 2011 to November 28, 2011.

27. During this visit Greenfield spent hours at Siegel's home and was the beneficiary of his hospitality both at his current residence and as a guest at his resort. During this visit Siegel informed Greenfield that he was doing well, that he had successfully resolved his financial issues and that Westgate remained highly profitable. This fact should have been obvious to her based upon the festive mood in Siegel's home and the fact she was once again provided with free accommodations. At no time during this visit did Greenfield ever mention Sundance or the Festival or especially, that she had submitted the film for consideration by the Sundance jury.

28. A mere two (2) days later, on November 30, 2011, Siegel learned that the Film was selected for the 2012 Sundance Film Festival (the "Festival") and was scheduled to be shown at the Festival on opening night, January 19, 2012 in Park City, Utah—the same city where Westgate owns and operates its ski resort.

29. At this same time, Sundance issued a press release describing the Film as follows:

> The Queen of Versailles / U.S. (Director: Lauren Greenfield) – Jackie and David were triumphantly constructing the biggest house in America – a sprawling 90,000 square-foot palace inspired by Versailles – *when their timeshare empire collapses and their house is foreclosed. Their rags-to-riches-to rags story* reveals the innate virtues and flaws of the American Dream. (the "Original Sundance Description") (emphasis supplied).

A true and correct copy of the Original Sundance Description is attached hereto as **Exhibit "B"**.

30. The Original Sundance Description contains the following false and defamatory statements:

    a. their timeshare empire collapses;
    b. their house is foreclosed; and
    c. rags-to-riches-to rags story.

31. Taken individually and collectively these statements portray Siegel and Westgate as essentially broke and out of business.

5

32. Indeed, contrary to this description, the actual facts were that Siegel's timeshare empire never collapsed.

33. The use of the word "collapse" falsely indicated that Siegel and Westgate had failed financially, which they clearly have not, and after Westgate's sale of its interest in Planet Hollywood Towers by Westgate, it continues to own and operate its remaining 27 resorts.

34. The phrase "rags-to-riches-to-rags" clearly and falsely portrays Siegel himself as currently broke and financially destitute, which is not the case, given that Westgate is stable, profitable and has not collapsed.

35. Upon learning of the false and defamatory statements in the Original Sundance Description, Siegel immediately contacted Greenfield to address these statements. A true and correct copy of correspondence sent to Greenfield on December 1, 2011 is attached hereto as **Exhibit "C"**.

36. Greenfield and her husband Evers—who is the executive producer of the Film—agreed with Siegel that the Sundance Description was false and that they would be taking all necessary steps to correct it.

37. Despite Greenfield and Evers' promises, the Original Sundance Description had already been transmitted to various media outlets and appeared all over the Internet.

38. Ultimately the Original Sundance Description was revised to state:

> Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire falters due to the economic crisis. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream." (the "Revised Sundance Description").

A true and correct copy of the Revised Sundance Description is attached hereto as **Exhibit "D"**.

39. Nonetheless, the phrase "rags-to-riches-to rags story" in the Revised Sundance Description continues to be a false and defamatory statement describing Siegel and Westgate.

40. As late as December 30, 2011, after a month's notice to Greenfield and Evers that the Original Sundance Description was false and defamatory, the Original Sundance Description appeared on over 12,000 websites including most glaringly on Greenfield's own website. A true and correct copy of a screenshot from Greenfield's website on December 30, 2011 is attached hereto as **Exhibit "E"**.

41. Greenfield's website stated specifically as of December 30, 2011: "Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire collapses and their house is foreclosed. Their rags-to-riches-to-rags story reveals the innate virtues and flaws of the American Dream". *See* **Exhibit "E"**.

42. Therefore, even though Greenfield and Evers were on notice of the false and defamatory statements in the Original Sundance Description, they continued to publish the false and defamatory statements on Greenfield's own personal website at least as late as December 30, 2011.

43. In addition, Sundance was notified on December 31, 2011 that the Revised Sundance Description continued to contain false and defamatory statements. A copy of this correspondence sent to Sundance is attached hereto as **Exhibit "F"**. Nonetheless, as of January 4, 2012, the Revised Sundance Description continued to appear on Sundance's website. A true and correct copy of a screenshot from January 4, 2012 showing the Revised Sundance Description on Sundance's website is attached hereto as **Exhibit "D"**.

44. Sundance's, Greenfield's and Evers' continued campaign and proliferation of false and defamatory statements regarding Siegel and Westgate is motivated by ill will and malice, and at the very least with a reckless disregard for the truth, since despite being informed on numerous occasions that the Original and Revised Sundance Descriptions contained false and defamatory statements regarding Siegel and Westgate, Sundance, Greenfield and Evers continued to publish these statements on the Internet, causing damages to Siegel and to Westgate.

## COUNT I
## DEFAMATION
## (as to Sundance)

45. Siegel and Westgate reallege each of the allegations set forth in paragraphs 1 through 44 *supra*, as though fully set forth herein.

46. This is an action for damages against Sundance arising from certain defamatory statements made against Siegel and Westgate.

47. Prior to the publication of the defamatory statements that are the subject of this lawsuit, Siegel and Westgate enjoyed a reputation for honesty, integrity and trustworthiness in the community and a financial reputation for creditworthiness.

48. Westgate, is and at all material times hereunder was, an entity of good name and reputation and enjoys the financial reputation, esteem and good opinion of the business community at large, its customers, and all others who conduct business with Westgate.

49. From on or around November 30, 2011 until the present, Sundance has made certain defamatory statements concerning Siegel's and Westgate's financial situation to the general public via the Internet and via various press releases.

50. In so doing, Sundance has made false statements to the aforementioned third parties which are as follows:

 a.   their timeshare empire collapses;
 b.   their house is foreclosed; and
 c.   rags-to-riches-to rags story.

51. Upon being notified of the false statements, Sundance continued to publish the false statement "rags-to-riches-to-rags story" in the Revised Sundance Description evidencing Sundance's actual malice and reckless disregard for the truth.

52. The statements in paragraph 50 above were false and intended to degrade and injure Siegel and Westgate and their good will, credit and reputation, and have exposed Siegel and Westgate to distrust and ridicule.

53. The above statements, and economic depiction which the statements create about Siegel and Westgate, are false, malicious, defamatory and published in complete disregard to their obviously harmful effect of Siegel and Westgate's reputation and good standing in the community.

54. Further, not only were the above statements false, misleading and defamatory, but they were made maliciously intending to injure Siegel and Westgate for the purpose of promoting the Film.

55. As a result of the defamatory statements, Siegel and Westgate have been injured in their good name, credit and reputation, have been shunned by customers and the business community, specifically the Park City area, with whom they previously had business relations and have suffered a loss of customers and diminished profits.

56. To date, Westgate has received calls or inquiries from various owners and potential customers questioning the financial security of Westgate based upon the false and defamatory statements issued in the Original and Revised Sundance Descriptions.

WHEREFORE, Plaintiffs, David A. Siegel and Westgate Resorts, Ltd. demand judgment against Defendant, Sundance Institute, Inc. for:

(a) For compensatory, incidental and consequential damages in excess of $75,000.00;
(b) For punitive damages;
(c) For their Court costs; and
(d) Any other relief this Court deems just and proper.

## COUNT II
## DEFAMATION
### (as to Greenfield and Evers)

57. Siegel and Westgate reallege each of the allegations set forth in paragraphs 1 through 44 *supra*, as though fully set forth herein.

58. This is an action for damages against Defendants Greenfield and Evers arising from certain defamatory statements made against Siegel and Westgate.

59. Prior to the publication of the defamatory statements that are the subject of this lawsuit, Siegel and Westgate enjoyed a reputation for honesty, integrity and trustworthiness in the community and a financial reputation for creditworthiness.

60. Westgate, is and at all material times hereunder was, an entity of good name and reputation and enjoys the financial reputation, esteem and good opinion of the business community at large, its customers, and all others who conduct business with Westgate.

61. From on or around November 30, 2011 until the present, Greenfield and Evers have published certain defamatory statements concerning Siegel's and Westgate's financial welfare to the general public via the Internet, specifically via Greenfield's personal website.

62. In so doing, Greenfield and Evers have made false statements to the aforementioned third parties which are as follows:

    a.    their timeshare empire collapses;
    b.    their house is foreclosed; and
    c.    rags-to-riches-to rags story.

63. Upon being notified of the false statements on or around December 1, 2011, Greenfield and Evers continued to publish the false statements on Greenfield's own personal website at least as late as December 30, 2011 evidencing Greenfield and Evers' actual malice and reckless disregard for the truth.

64. The statements in paragraph 62 above were false and intended to degrade and injure Siegel and Westgate and their good will, credit and reputation, and have exposed Siegel and Westgate to distrust and ridicule.

65. The above statements, and economic depiction which the statements create about Siegel and Westgate, are false, malicious, defamatory and published in complete disregard to their obviously harmful effect of Siegel's and Westgate's reputation and good standing in the community.

66. Further, not only were the above statements false, misleading and defamatory, but they were made maliciously intending to injure Siegel and Westgate for the purpose of promoting the Film.

67. As a result of the defamatory statements, Siegel and Westgate have been injured in their good name, credit and reputation, have been shunned by customers and the business community, specifically the Park City area, with whom they previously had business relations and have suffered a loss of customers and diminished profits.

68. To date, Westgate has received calls from various owners and potential customers questioning the financial security of Westgate based upon the false and defamatory statements issued in the Original and Revised Sundance Descriptions.

WHEREFORE, Plaintiffs, David A. Siegel and Westgate Resorts, Ltd. demand judgment against Defendants, Lauren Greenfield and Frank Evers for:

(e) For compensatory, incidental and consequential damages in excess of $75,000.00;
(f) For punitive damages;
(g) For their Court costs; and
(h) Any other relief this Court deems just and proper.

Respectfully submitted,

*/s/ Kath Saft/*

MICHAEL MARDER, ESQ.
Florida Bar No. 251887
RICHARD W. EPSTEIN, ESQ.
Florida Bar No. 229091
KATHRYN SAFT, ESQ.
Florida Bar No. 041069
GREENSPOON MARDER, P.A.
Attorneys for Plaintiff
Capital Plaza I
201 East Pine Street, Suite 500
Orlando, Florida 32801
Telephone No. (407) 425-6559
Facsimile No. (407) 422-6583