IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO.: 6:12-cv-35-ORL-18-GJK

WESTGATE RESORTS, LTD.
a Florida limited partnership

       Plaintiff,

v.

LAUREN GREENFIELD, an individual,
FRANK EVERS, an individual, and
GREENFIELD/EVERS LLC dba Evergreen Pictures,
a Delaware limited liability company,
MAGNOLIA PICTURES COMPANY, a Delaware
limited liability company, and BRAVO MEDIA,
LLC, a Delaware limited liability company

       Defendants.
_____/

## SECOND AMENDED COMPLAINT

Plaintiff Westgate Resorts, Ltd. (hereinafter "Westgate"), sues Defendants, Lauren Greenfield (hereinafter "Greenfield"), Frank Evers (hereinafter "Evers"), Greenfield/Evers LLC dba Evergreen Pictures (hereinafter "G/E"), Magnolia Pictures Company (hereinafter "Magnolia"), and Bravo Media, LLC (hereinafter "Bravo") (collectively, "Defendants") and states as follows:

### JURISDICTION AND VENUE

1.     This is an action for damages in excess of $75,000.00, exclusive of costs and for declaratory relief and is within the jurisdictional limits of this Court.

1

**EXHIBIT
"A"**

2.      This Court has jurisdiction over the claims under 28 U.S.C. §1332 because the amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs and because the parties have diversity of citizenship.

3.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391, because as set forth below, the events giving rise to Plaintiff's claims occurred in Orange County, Florida, Defendants' conduct giving rise to these claims occurred in substantial part in Orange County, Florida and because Defendants purposefully availed themselves of the Internet's distribution network in Orange County, Florida so as to be subject to the personal jurisdiction of the Middle District of Florida.

## PARTIES

4.      Westgate Resorts, Ltd. is a limited partnership formed under and pursuant to the laws of Florida with its principal place of business in Orange County, Florida. The general partner of Westgate Resorts, Ltd. is Westgate Resorts, Inc., a corporation formed under and pursuant to the laws of Florida, which likewise maintains its principal place of business in Orange County, Florida.  David Siegel, a resident of Orange County, Florida and a citizen of the state of Florida, is the president and sole director of the general partner. Any and all limited partners of Westgate Resorts, Ltd. are citizens of the state of Florida.

5.      Lauren Greenfield is an individual believed to reside in Los Angeles County, California and is, accordingly, a citizen of the state of California.

6.      Frank Evers is an individual believed to reside in Los Angeles County, California, and is, accordingly, a citizen of the state of California.

7.      Greenfield/Evers LLC is a Delaware limited liability company, registered and authorized to transact business as a foreign corporation in the State of California, which

maintains its principal office for the transaction of its business in Venice, California. G/E is known as and commonly transacts business as Evergreen Pictures. Greenfield and Evers are the principals, officers and authorized agents of G/E.

8.      Magnolia Pictures Company is a Delaware limited liability company with its principal place of business in Austin, Texas.

9.      Bravo Media, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

10.     All conditions precedent to the maintenance to the cause of action set forth herein have occurred, been waived or excused.

## GENERAL AND FACTUAL ALLEGATIONS

11.     Westgate is a privately-held timeshare and development company that owns and operates twenty-seven (27) resorts around the country.

12.     Notably, Westgate owns a ski resort in Park City, Utah which does the bulk of its business during the winter ski season each year.

13.     Westgate was thriving as of 2008, before Lehman Brothers collapsed and the global economic crisis began.

14.     As an unfortunate result of the Lehman Brothers collapse, which reverberated throughout the world financial markets, the credit and capital markets froze and Westgate's access to financing – until that time freely available to Westgate – was unforeseeably restricted. Notwithstanding the economic difficulties plaguing the nation, and although the timeshare industry was dramatically affected by these adverse financial conditions, Westgate's sales remained strong.

15.     During this same time frame, Westgate had undertaken to construct its largest resort: the Planet Hollywood Towers by Westgate (the "Towers") on the "Strip" in Las Vegas, Nevada.

16.     Following its commitment to this project, Westgate suffered, as did all of the real estate segment of the U.S. economy, from the fundamental change in market conditions, including, especially, the sudden unavailability of credit.

17.     Like many companies, Westgate was required to adjust to the economic conditions.  This meant cutting costs and implementing efficiency measures within the company. Because of these efforts, Westgate weathered the financial storm so that it has been able to take advantage of improving market conditions.

18.     As a key part of its plans, on November 21, 2011, Westgate sold its interest in the Towers and successfully restructured its debt.

19.     Currently, Westgate is a stable and profitable company.

## The Film and Sundance

20.     In or around August, 2007, Greenfield approached David Siegel ("Siegel"), the president and CEO of Westgate, and asked him whether or not he would be interested in being a subject for a documentary film to be directed by Greenfield and produced by Greenfield's production company, G/E (the "Film").

21.     Greenfield expressed to Siegel that the Film would center on the construction of the new home Siegel was then building in Orlando, Florida, which locally became commonly known as "Versailles."

22.     Siegel agreed to permit Greenfield to shoot footage for the Film, primarily in Orange County, Florida.

23.     Ultimately, the Film was completed around four (4) years later.

24.     Throughout the four (4) year filming process, Westgate frequently provided Greenfield and her Film crew with rooms at Westgate's various resorts throughout country, and Siegel even accommodated Greenfield and her Film crew at his current personal residence in Orlando.

25.     Since 2009, Westgate provided Greenfield and her Film crew with approximately 165 room nights at Westgate's resorts, as depicted on the breakdown attached hereto as **Exhibit "A."**

26.     The last time Greenfield and her Film crew visited Siegel in his personal home and stayed at Westgate's resorts was from November 26, 2011 to November 28, 2011.

27.     During this visit Greenfield spent hours at Siegel's home and was the beneficiary of his hospitality both at his current residence and as a guest at a Westgate resort.  During this last visit Siegel informed Greenfield that Westgate had resolved its financial issues and remained highly profitable. Indeed, this fact was obvious to Greenfield given the festive mood in Siegel's home and the fact she was once again provided with free accommodations.  At no time during this visit did Greenfield ever mention Sundance Institute, Inc. ("Sundance") or the 2012 Sundance Film Festival (the "Festival") or, especially, that she had submitted the film for consideration by the Sundance jury.

28.     A mere two (2) days later, on November 30, 2011, Siegel learned that the Film was selected for the Festival and was scheduled to be shown at the Festival on opening night, January 19, 2012 in Park City, Utah—the same city where Westgate owns and operates its ski resort.

29.   At this same time, Sundance, in collaboration with Greenfield, Evers, and G/E, and/or with Greenfield, Evers, and G/E's authorization and/or acquiescence, issued a press release describing the Film as follows:

> *Queen of Versailles* follows billionaires David and Jacqueline Siegel and their attempts to build the biggest house in America (affectionately dubbed "Versailles") – a 90,000 sq foot palace just outside of Orlando, which features 23 bathrooms, 13 bedrooms, 10 kitchens and three pools.
>
> When the global banking crisis hits, however, ***the timeshare tycoon and his socialite wife are forced to sell off the unfinished property or face economic ruin.***
>
> …
>
> With the economy still struggling, *Versailles* offers an insight into the belt-tightening being undertaken at the upper end of the socioeconomic spectrum, and – judging by last year's IDFA trailer – the film has plenty of potential for slightly absurd comic relief.
>
> The Queen of Versailles / U.S. (Director:  Lauren Greenfield) – Jackie and David were triumphantly constructing the biggest house in America – a sprawling 90,000 square-foot palace inspired by Versailles – ***when their timeshare empire collapses and their house is foreclosed.  Their rags-to-riches-to rags story*** reveals the innate virtues and flaws of the American Dream. (the "Original Sundance Description") (emphasis supplied).

A true and correct copy of the Original Sundance Description is attached hereto as **Exhibit "B."**

30.   The Original Sundance Description contains the following false and defamatory statements:

> a.   the timeshare tycoon and his socialite wife are forced to sell off the unfinished property or face economic ruin;
> b.   their timeshare "empire" collapses;
> c.   their house is foreclosed; and
> d.   rags-to-riches-to rags story.

31.   Taken individually and collectively, the statements above portray Siegel and Westgate as essentially broke and out of business.

32.     Indeed, contrary to this description, the actual facts were that Siegel's "timeshare empire" never collapsed and he was never "forced to sell Versailles or face economic ruin."

33.     The use of the words "collapse" and "economic ruin" falsely indicated that Siegel and Westgate had failed financially, which they clearly have not. To the contrary, although having sold its interest in Planet Hollywood Towers by Westgate, Westgate continues to own and successfully operate its remaining 27 resorts.

34.     The phrase "rags-to-riches-to-rags" clearly and falsely portrays Siegel himself, and given his ownership of Westgate, Westgate itself as currently broke and financially destitute, which is not the case, given that Westgate is stable, profitable and has not collapsed.

35.     Upon learning of the false and defamatory statements in the Original Sundance Description, Siegel immediately contacted Greenfield to address these statements. A true and correct copy of correspondence sent to Greenfield on December 1, 2011 is attached hereto as **Exhibit "C."**

36.     Greenfield and her husband Evers—who is the executive producer of the Film— agreed with Siegel, for themselves and for G/E, that the Sundance Description was false and that they would be taking all necessary steps to correct it.

37.     Greenfield's and Evers', individually and for G/E, promises went unfulfilled as the Original Sundance Description had at such time already been transmitted to various media outlets and appeared all over the Internet, something of which Westgate believes Defendants well knew when they made such promises.

38.     Eventually the Original Sundance Description was revised to state:

> Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – when their timeshare empire falters due to the economic crisis. Their rags-to-riches-to-rags story reveals the

innate virtues and flaws of the American Dream." (the "Revised Sundance Description").

A true and correct copy of the Revised Sundance Description is attached hereto as **Exhibit "D."** However, this revision of the Original Sundance Description could not correct the false statements already rampant because of, among other things, the virus-like distribution of the Original Sundance Description throughout the Internet.

39.    As late as December 30, 2011, after a month's notice to Greenfield, Evers and G/E that the Original Sundance Description was false and defamatory, a portion of the Original Sundance Description had saturated the Internet, appearing in over 12,000 websites including most glaringly on Defendants' own website. A true and correct copy of a screenshot from Defendants' website on December 30, 2011 is attached hereto as **Exhibit "E."**

40.    Even though they knew that the truth and facts of the highlighted text below were to the contrary, Defendants' website continued to state as of December 30, 2011:

> Jackie and David were triumphantly constructing the biggest house in America – a sprawling, 90,000-square-foot palace inspired by Versailles – *when their timeshare empire collapses and their house is foreclosed*. Their *rags-to-riches-to-rags story* reveals the innate virtues and flaws of the American Dream. (*e.s.*)

*See* **Exhibit "E."**

41.    Therefore, even though Greenfield, Evers and G/E were on notice of the false and defamatory statements in the Original Sundance Description, they continued to publish the false and defamatory statements on Greenfield's own personal website at least as late as December 30, 2011.

42.    Thereafter, amidst the pervasively disseminated false portrayal of Siegel and Westgate in both the Original Sundance Description and the Revised Sundance Description,

which Defendants exploited for their collective economic gain, Defendants premiered the Film at Sundance on January 19, 2012.

43.     When the original complaint was filed, Siegel had not had the opportunity to see the Film. However, on April 14, 2012, Siegel was able to see the film for the first time.

44.     In addition to the false and malicious press releases, the Film falsely depicts Westgate in an array of defamatory, derogatory and damaging ways too numerous to enumerate here, but which includes, among others, as (a) failing to pay its bills to the contractor that built the Towers giving the viewer the false impression that Westgate does not pay its bills (indeed the Film fails to disclose that the contractor's claims are disputed and Westgate has an affirmative claim against its contractor for over $40 million dollars); (b) being compelled to layoff its workforce because of, specifically, the Towers' contractor's claims (events which, despite this false portrayal, were not at all connected); and (c) essentially broke and out of business, on the verge of bankruptcy. Westgate has demanded that steps be taken to correct the false and defamatory impressions created about Westgate's financial status; however, Defendants, knowing that the perceived salaciousness of the Film and the false impression it gives of the ruin of members of the financial elite enhanced its appeal and marketability to the demographics to which Defendants', with their new found distributor, have targeted the Film, have flatly refused.

**Magnolia and Bravo's Promotion and Intended Distribution of the Film**

45.     Greenfield, Evers, and G/E have entered into agreements with Magnolia and Bravo to, *inter alia*, distribute the Film, both domestically and internationally.

46.     At the time that Magnolia and Bravo entered into such agreements, they knew or had reason to know that the Film falsely depicts Westgate's financial status.

47.     Indeed, certainly as of May 18, 2012 (Bravo) and June 8, 2012 (Magnolia), Magnolia and Bravo were aware of the falsity of the statements contained in the Film because counsel for Westgate informed Magnolia and Bravo of the pending suit and allegations against Greenfield, Evers, and G/E.  *See* **Composite Exhibit "F,"** true and correct copies of Counsel for Westgate's Letters to Magnolia and Bravo.

48.     Moreover, Magnolia recently published the official trailer for the Film and published it via YouTube.[1] The trailer, which was written, directed, produced, and funded by Magnolia, features excerpts from the Film which depict Westgate in a defamatory, derogatory and damaging way.

49.     Magnolia has further publicized the Film's trailer on its Facebook page.[2] Magnolia recently posted the following updates on Facebook:

> "Trailer premier of our upcoming film The Queen of Versailles! [linking Queen of Versailles Facebook page to Magnolia's Facebook page] In theaters from Magnolia Pictures July 20th – via The Queen of Versailles [linking Queen of Versailles Facebook page to Magnolia's Facebook page and posting link from youtube.com entitled 'The Queen of Versailles Official Trailer [HD]']"

> "Exciting! The Queen of Versailles [linking Queen of Versailles Facebook page to Magnolia's Facebook page] trailer has been named a 'HOT TRAILER' by Nikki Finke and the folks over at Deadline Hollywood [linking Deadline Hollywood's Facebook page to Magnolia's Facebook page]. Check it out if you have not seen it yet! The Queen of Versailles is in theaters July 20th. [posting link to deadline.com entitled 'Hot Trailer: The Queen of Versailles']"

---

1     The Film's official trailer produced by Magnolia is published online at http://youtu.be/AdJYzgJ4CwI.
2     Magnolia's Facebook page is published online at http://www.facebook.com/magnoliapictures.

*See* **Composite Exhibit "G,"** a true and correct copy of Magnolia's Facebook advertisements of the Film's trailer to publicize the Film's July 20, 2012 premier in theaters.

50.     Moreover, Magnolia controls a website[3] where it clearly promotes the Film, shows the official trailer, lists dates for Magnolia's upcoming in-theater release of the Film. *See* **Exhibit "H,"** a true and correct copy of a screenshot of Magnolia's website, accessed on June 11, 2012. Further, the Magnolia website lists the following quotes about the Film:

> "Greenfield's vision of a strain of nouveau riche both made and broken by imaginary economics stays with you: it's the wake-up call her subjects deserve." Karina Longworth, LA Weekly

> "An oddly spellbinding, must-see documentary. A portrait of American cluelessness by way of absurd financial irresponsibility, and a cautionary tale about the cost of living an unexamined life." Jeffrey Wells, Hollywood Elsewhere

> "Fascinating. A revenge fantasy for the 99 percent" – Daniel Fienberg, Hitfix (accessed from Magnolia's website on June 11, 2012)

51.     Magnolia has also issued press-releases with defamatory statements as to Westgate.  Additionally, numerous news outlets have reported Bravo's acquisition of the rights to publish the Film on television.

52.     Through Magnolia and Bravo's promotion of the Film, they have made defamatory statements as to Westgate, as demonstrated in the following excerpts from their press releases:

### The Magnolia Press Release (also appears on Magnolia's website)

> THE QUEEN OF VERSAILLES is a character-driven documentary about a billionaire family and their financial challenges in the wake of the economic crisis. With epic proportions of Shakespearean tragedy, the film follows two unique

---

3       Magnolia's website page on the Film is published online at http://www.magpictures.com/profile.aspx?id=c2f9de45-e3d0-4ca1-8521-249d8c10ddce.

characters, whose rags-to-riches success stories reveal the innate virtues and flaws of the American Dream. The film begins with the family triumphantly constructing the biggest house in America, a 90,000 sq. ft. palace. Over the next two years, their sprawling empire, fueled by the real estate bubble and cheap money, falters due to the economic crisis. Major changes in lifestyle and character ensue within the cross-cultural household of family members and domestic staff. (accessed from Magnolia's website on June 7, 2012)

### The Bravo Press Release

"The Queen of Versailles" is an insightful and entertaining documentary about billionaires Jackie and David Siegel, who are constructing the largest house in America – a 90,000 square foot dream home modeled after the palace of Versailles. As a result of the financial crisis, their extravagant plans are put on hold. David's time-share business runs into difficulties, and the filmmaker captures the Siegel's turn of fortune. While delivering big laughs, "The Queen of Versailles" also manages to be a moving, clear-eyed snapshot of a unique and sobering moment in our history, as we are forced to reevaluate the sustainability of the American dream. (dated April 3, 2012)

A true and correct copy of the Magnolia and Bravo Press Releases are attached hereto as

**Composite Exhibit "I."**

53.    In addition to writing, producing, directing and publicizing the trailer, the fact that

Magnolia and Bravo are publicizing their distribution of the Film indicates that Magnolia and

Bravo are funding the Film's continued publication at numerous film festivals such as:

- Full Frame Documentary Film Festival (Durham, NC) – April 13, 2012

- RiverRun International Film Festival (Winston-Salem, NC) – April 19 & 20, 2012

- Hawaii International Film Festival (Honolulu, HI) - April 19, 2012

- Sarasota Film Festival (Sarastota, FL) – April 14 & 15, 2012

- San Francisco International Film Festival (San Francisco, CA) – April 22, 2012

- USA Film Festival (Dallas, TX) – April 25, 2012

- Independent Film Festival Boston (Boston, MA) – May 2, 2012

- Canadian International Documentary Festival (Toronto, ON, Canada)– May 2, 3, & 4, 2012

- Miami International Film Festival (Miami, FL) – May 16, 2012

- Cinetopia International Film Festival (Ann Arbor, MI) – June 2, 2012

- Deadcenter Film Festival (Oklahoma City, OK) – June 9, 2012

- LA Film Festival (LA, CA) – June 15 & 16, 2012

- Provincetown International Film Festival (Provincetown, MA)– June 15, 2012

- Waterfront Film Festival (Saugatuck, MI) – June 17, 2012

54.     Through their statements in press releases, current publication of the trailer, and their financial backing of the Film at film festivals, Magnolia and Bravo are injuring Westgate by publicizing the Film's defamatory statements. Further, Magnolia and Bravo will continue to injure Westgate with their future distribution of the Film. Indeed, Westgate believes that discovery will reveal further defamatory conduct by Magnolia and Bravo by virtue of their publicizing, and preparation for distribution, of the Film.

### COUNT I
### DEFAMATION
### (as to the statements in the Original and Revised Sundance
### Descriptions, and the Magnolia and Bravo Press Releases )

55.     Westgate realleges each of the allegations set forth in paragraphs 1 through 54 *supra*, as though fully set forth herein.

56.     This is an action for damages against Defendants Greenfield, Evers, G/E, Magnolia, and Bravo for defamation.

57.     From on or around November 30, 2011 until the present, Defendants have published certain defamatory statements concerning Westgate's financial condition to the general public via the Internet and other media, including specifically via Defendants' own websites.

58.     In so doing, Defendants have made false statements to those who have accessed such websites and viewed the other forms of media which leave the impression that Westgate has collapsed financially and is otherwise in a state of financial ruin.

59.     Upon being notified of the false statements on or around December 1, 2011, Greenfield, Evers, and G/E continued to publish the false statements on Defendants' own website at least as late as December 30, 2011 evidencing their actual malice and reckless disregard for the truth.

60.     Further, upon notification of the false statements contained in the Film and the allegations of the Amended Complaint on or around May 18, 2012 (Bravo) and June 8, 2012 (Magnolia), Magnolia and Bravo continued to promote and publicize the Film and continue their intent to distribute the Film evidencing their actual malice and reckless disregard for the truth.

61.     The statements excerpted in paragraphs 29-20, 38, 40 and 44 above were false and intended to degrade and injure Westgate in its good will, credit and reputation, and has exposed Westgate to distrust in the financial dealings and ridicule in the markets in which it conducts its business.

62.     The above statements, and economic depiction which the statements create about Westgate, are false, malicious, defamatory and published in complete disregard to their obviously harmful effect on Westgate's reputation and good standing in the community.

63.     Further, not only were the above statements false, misleading and defamatory, but they were made maliciously intending to injure Westgate for the purpose of promoting the Film for Defendants' financial gain.

64.     As a result of the defamatory statements, Westgate has been injured in its good name, credit and reputation, has been shunned by customers and the business community, specifically the Park City area, with whom it previously had business relations, and has suffered a loss of customers and diminished profits.

WHEREFORE, Plaintiff, Westgate Resorts, Ltd., demands judgment against Defendants, Lauren Greenfield, Frank Evers and Greenfield/Evers LLC, Magnolia Pictures Company and Bravo Media LLC for:

(a)     For compensatory, incidental and consequential damages in excess of $75,000.00;
(b)     For punitive damages;
(c)     For their Court costs; and
(d)     Any other relief this Court deems just and proper.

## COUNT II
## DEFAMATION – FALSE LIGHT
### (as to Westgate's portrayal in the Film and the Film's trailer)

65.     Westgate realleges each of the allegations set forth in paragraphs 1 through 54 and paragraphs 61 through 64 of Count I *supra*, as though fully set forth herein.

66.     This is an action for damages against Defendants Greenfield, Evers, G/E, Magnolia and Bravo arising from the false and defamatory portrayal of Westgate in the Film and in the Film's trailer.

67.     With the release of the Film on January 19, 2012 at Sundance, and with each subsequent showing of the Film, Defendants have published certain false and defamatory statements concerning Westgate's financial welfare to the general public and falsely portrayed Westgate via the Film and the Film's trailer.

15

68.     In so doing, Defendants have, for their own financial gain, falsely portrayed Westgate to the viewers of the Film and the Film's trailer, purposely giving the viewer the impression that Westgate has collapsed financially and is otherwise in a state of financial ruin.

69.     Despite being notified of the false portrayal of Westgate in the pre-release marketing on or around December 1, 2011, and knowing that the Film itself perpetuates in greatly more detail the same false impressions, Greenfield, Evers, and G/E, for their financial gain, released the Film at Sundance and, through a distribution agreement they have reached, will continue to show the Film, evidencing their actual malice and reckless disregard for the truth.

70.     Further, upon notification of the false statements contained in the Film and the allegations of the Amended Complaint on or around May 18, 2012 (Bravo) and June 8, 2012 (Magnolia), Magnolia and Bravo continued to promote and publicize the Film, and continue their intent to distribute the Film evidencing their actual malice and reckless disregard for the truth.

71.     Indeed, Magnolia recently published the official trailer to advertise the Film's July 20, 2012 release and has advertised the trailer, which is published on YouTube, on its website and Facebook page. The trailer, which was written, directed, produced, and funded by Magnolia, features excerpts from the Film which depict Westgate in a defamatory, derogatory and damaging way.

72.     Beyond Defendants' purposeful false portrayal in the Film and the Film's trailer of Westgate's financial condition, Defendants have likewise falsely depicted the Film as a "documentary," when in fact, unbeknownst to Defendants' intended audience, the Film is a staged, theatrical production, albeit using non-professionals in the starring roles (as themselves) rather than professional actors.  Such a scheme was designed by Defendants to give the Film's

viewers the false impression that what is portrayed on-screen was reality when it was really a theatrical production, more fictional than real. The Film's construct as a reputed "documentary," predicated as it is on this inherent deception, is to give credence and a perception of truth to its contents, exacerbating the harm generated by the Film's false portrayal of Westgate's financial condition.

73.     The illustrative (but by no means exhaustive) enumeration of matters depicted in the Film and the Film's trailer summarized in paragraph 44 above were false and intended to degrade and injure Westgate and its good will, credit and reputation, and have exposed Westgate to distrust and ridicule.

74.     The above statements, and economic depiction which the statements create about Siegel and Westgate, are false, malicious, defamatory and published via the Film and the Film's trailer in complete disregard to their obviously harmful effect of Westgate's reputation and good standing in the community.

75.     Further, not only were the above statements in the Film and the Film's trailer false, misleading and defamatory, but they were made maliciously intended to injure Westgate for Defendants' own financial gain.

76.     As a result of the defamatory statements in the Film and the Film's trailer, Westgate has been injured in its good name, credit and reputation, has been shunned by customers and the business community, specifically the Park City area, with whom it previously had business relations, and has suffered a loss of customers and diminished profits.

WHEREFORE, Plaintiff, Westgate Resorts, Ltd., demands judgment against Defendants, Lauren Greenfield, Frank Evers, Greenfield/Evers LLC, Magnolia Pictures Company and Bravo Media LLC for:

(a)     For compensatory, incidental and consequential damages in excess of $75,000.00;

(b)     For punitive damages;

(c)     For their Court costs; and

(d)     Any other relief this Court deems just and proper.

**COUNT III**
**ACTION FOR DECLARATORY RELIEF**

61.     Westgate realleges each of the allegations set forth in paragraphs 1 through 54 *supra*, as though fully set forth herein.

62.     This is an action for declaratory and further relief pursuant to 28 U.S.C. §§ 2201 & 2202.

63.     Richard Siegel is the son of David Siegel.

64.     Richard Siegel is engaged in sales and marketing activities on behalf of Westgate Marketing LLC, an entity separate and distinct from Westgate Resorts, Ltd. and is neither an officer, director or employee of Westgate Resorts, Ltd. or its general partner, Westgate Resorts, Inc.

65.     Attached as **Exhibit "J"** is a document Greenfield presented to Richard Siegel and asked that he sign.  At that time, Richard Siegel and his wife were vacationing in New York City over the 2011 Thanksgiving weekend. The document, as Greenfield presented it to Richard Siegel, consisted of only the type-written text; the underscored portions at or near the top and bottom of the page were completely blank and uncompleted. Richard Siegel signed his name to the document. But, when Richard Siegel did so, the hand-written name "Westgate Resorts" (not in Richard Siegel's hand) did not appear in the underscored space on the document's second line, nor was Richard Siegel's signature accompanied, then or now, by any descriptor of status or capacity.  Nor did Greenfield ever inform Richard Siegel that she was asking that he sign this document for or on behalf of Westgate or in any capacity other than as an individual appearing in

the Film. Nonetheless, Defendants now portray this document as a release of, among other things, the claims that Westgate asserts in this lawsuit. Defendants claim that Richard Siegel signed this document for and on behalf of Westgate Resorts, Ltd.

66.     While the signature on **Exhibit "J"** is the signature of Richard Siegel, no title is indicated, nor is there any indication that Richard Siegel is signing in an authorized capacity. And in fact Richard Siegel, as well known to Defendants, did not have and never has had the authority to sign such a document for or in behalf of Westgate. Defendants well knew that such authority rested in David Siegel alone. Defendants, during the more than four (4) years they took to create and complete the Film, throughout the hundreds of days they spent in residence in David Siegel's home and in Westgate's resorts, never asked for nor discussed with David Siegel a release for or on behalf of Westgate. Nor has Westgate ever given or authorized the grant of such a release. In particular, the execution of the document – **Exhibit "J"** – Defendants presently characterize as such a release was not and has never been authorized by Westgate and is not the knowing, voluntary or effective waiver of any right by Westgate. Westgate, as it did not sign and did not authorize the execution of the document (**Exhibit "J"**), has not and does not agree to the arbitration of the claims that it has made in this lawsuit.

67.     The Defendants have asserted and are likely to continue to assert the validity of **Exhibit "J"** not only as releasing and operating as a bar of Westgate's claims, but also requiring binding arbitration of any issues relating to the release, including the claims Westgate is now asserting. Westgate, as the foregoing makes apparent, vehemently disagrees, disputing the validity of **Exhibit "J"** as anything more than a document signed by Richard Siegel, as an individual, with whatever legal import that may have.

68.     There is, accordingly, a judiciable and bona fide dispute about what **Exhibit "J"** is purported to be, about the validity of any release of claims **Exhibit "J"** purports to effectuate and whether **Exhibit "J"** is an agreement to arbitrate as contemplated by The Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).  There is, therefore, a present, actual and existing controversy to be resolved by means of a declaration of this Court

WHEREFORE, Plaintiff, Westgate Resorts, Ltd. demands that the Court:

(a)     Declare the rights and legal relations of Westgate and Defendants in connection with **Exhibit "J"**;

(b)     Declare that **Exhibit "J"** is not a release by and is otherwise non operative and not binding on Westgate; and

(c)     Grant and award such other relief as necessary or proper.

Dated June __, 2012

*/s/ Richard W. Epstein*
MICHAEL MARDER, ESQ.
Florida Bar No. 251887
Michael.marder@gmlaw.com
RICHARD W. EPSTEIN, ESQ.
Florida Bar No. 229091
Richard.epstein@gmlaw.com
KATHRYN SAFT, ESQ.
Florida Bar No. 041069
Kate.saft@gmlaw.com
GREENSPOON MARDER, P.A.
Attorneys for Plaintiff
Capital Plaza I
201 East Pine Street, Suite 500
Orlando, Florida 32801
Telephone No. (407) 425-6559
Facsimile No. (407) 422-6583

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification per service list attached on this ___th day of June, 2012; and a copy was furnished via electronic mail delivery to Lincoln Bandlow, Esquire, Lathrop & Gage, LLP, 1888 Century Park East, Suite 1000, Los Angeles, CA 90067 and Magnolia Pictures Company, c/o William Banowsky, Jr., Registered Agent, 600 Congress Avenue, Suite 1400, Austin, Texas 78701 and Chris Matson, Esquire, Head of Business & Legal for Magnolia Pictures, LLC, 49 W. 27th Street, 7th Floor, New York, NY 10001, and Bravo Media LLC, CT Corporation System, 111 Eighth Avenue, New York, NY 10011 and Richard Cotton, Esquire, Executive VP and General Counsel for NBC Universal, Inc., 30 Rockefeller Plaza, New York, NY 10112.

*/s/ Richard W. Epstein*
RICHARD W. EPSTEIN

9440115 00108.2176Pleading