IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:12-cv-35-ORL-18-GJK

WESTGATE RESORTS, LTD.,
a Florida limited partnership,

        Plaintiff,

v.

LAUREN GREENFIELD, an individual,
FRANK EVERS, an individual, and
GREENFIELD/EVERS LLC dba Evergreen Pictures,

        Defendants.
_____/

## WESTGATE'S PRE-HEARING MEMORANDUM OF LAW ON DEFENDANTS' MOTION TO STAY ACTION PENDING ARBITRATION

In anticipation of the evidentiary hearing set for December 3, 2012 to determine whether Plaintiff Westgate Resorts, Ltd. ("Westgate" or "Plaintiff") made an agreement with Defendants to submit this dispute to binding arbitration, Westgate files this Pre-Hearing Memorandum.

## PROCEDURAL BACKGROUND[1]

This case arises out of the disparaging depiction of Westgate in a documentary film titled "Queen of Versailles" (the "Film") directed by Defendant Lauren Greenfield ("Greenfield") and produced by Greenfield's production company, Greenfield/Evers, LLC ("G/E"). Plaintiff filed its Amended Complaint on May 11, 2012 asserting seeking claims for defamation, false light defamation and declaratory relief. Instead of addressing the merits of Westgate's claims in a responsive pleading to the Amended Complaint, Defendants filed a Motion to Stay the Action

---

1. A more detailed factual and procedural background to this case appears in Plaintiff's Response to Defendants' Motion to Stay the Action Pending Arbitration [DE 43] which is incorporated as though fully set forth herein.

1

Pending Arbitration (the "Motion to Stay")[2] contending that a document Richard Siegel – who is not a party to this case - signed on or around November 26, 2011 (the "Release") required Westgate's claims be submitted to binding arbitration. This Court denied the Motion to Stay holding that "the issue of whether Richard Siegel, the signatory on the release, had the authority to bind Plaintiff under the release goes to the existence of the agreement rather than to its validity; thus, requiring this Court, rather than arbitrator, to determine whether an agreement exists between the parties."[3] In order to determine whether or not an agreement to arbitrate exists, the Court set an evidentiary hearing limited to this narrow issue. *Id.* In advance of the hearing, the parties engaged in limited discovery. The discovery revealed that, in fact, no agreement to which Westgate is a party exists because: (i) Richard Siegel – the only signatory to the Release - did not have actual authority to sign the Release on behalf of Westgate; and (ii) Richard Siegel did not have apparent authority to sign the Release on behalf of Westgate.

## FACTUAL SUMMARY

**A. Corporate Structure of the enterprise known as "Westgate Resorts"**

Westgate Resorts, Ltd., the only plaintiff in this case, is one of many distinct legal entities comprising the business organization known as "Westgate Resorts" that owns, operates, manages, markets and sells timeshare interests at various resorts throughout the country. At the top of the Westgate Resorts organizational chart is Central Florida Investments, Inc., which is the 99 percent owner of Westgate Resorts, Ltd.[4] Westgate Resorts, Ltd., the plaintiff in this case, is one of several companies that develops, manages and sells inventory at timeshare resorts.[5]

---

2. [DE 30].
3. *See* Order [DE 48].
4. Deposition of David A. Siegel, attached hereto as Exhibit "A", p.5.
5. *Id.* at pp. 5-6.

Another company, Westgate Marketing, LLC, conducts sales and marketing services for the resorts.[6] Richard Siegel is employed by Westgate Marketing, LLC, which acts as the broker for Westgate Resorts, Ltd. (and other of the timeshare developer entities) to market and sell timeshare inventory at the individual timeshare resorts.[7]

### B. Richard Siegel's Position within the "Westgate Resorts" Organization

Richard Siegel's job title with Westgate Marketing, LLC is "vice president".[8] However, the designation of "vice president" is strictly honorary, unaccompanied by any of the traditional corporate authority such a position might otherwise garner its occupant. Indeed, that title – as with Richard Siegel, devoid of any presumptive actual corporate authority - has been bestowed upon approximately a dozen other individuals working for one of the distinct companies within the Westgate Resorts organization.[9] In fact, there are only two actual corporate officers in the organization—David Siegel who is president and secretary and Tom Dugan who is the treasurer.[10] And Greenfield generally knew this. Greenfield recently testified in deposition, claiming that in her interview with Richard Siegel, he represented that "he was one of seven top executives"; in truth, Richard Siegel told Greenfield: "I'm not - - I'm – still I'm definitely not his right-hand man. He has about seven executives. I'm just one of them, but I do a lot of work."[11]

### C. The Release

This document was signed by Richard Siegel, but nowhere does this document identify his title or position with any organization nor does it designate the entity for whom Richard

---

6.  *Id.* at p.6.
7.  Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 16.
8.  Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 23.
9.  Deposition of David A. Siegel, attached hereto as Exhibit "A",, p. 16.
10. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 10.
11. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 44-45.

Siegel was supposedly signing this document. So on its face, the document was presumably signed, at the time he signed it (before Greenfield later hand wrote the phrase "Westgate Resorts" in a blank line), by Richard Siegel, for himself and for no-one else.[12] Richard Siegel testified that at the time he signed the Release, the space where, ostensibly, the name of an organization could be stated, was left blank.[13] Lauren Greenfield testified that she – not Richard Siegel, the signatory - handwrote the name "Westgate Resorts" at the top of the Release but did clarify who or what precisely this descriptor was meant to identify.[14] In addition, nothing appeared under Richard Siegel's signature to designate his title, position or connection to "Westgate Resorts".[15] Greenfield testified that she "never thought of asking him to write his title [on the Release]. . .[and] never asked him if he was authorized to authorize the filming."[16] In addition to Greenfield, there were two other individuals present when Richard Siegel signed the Release, Brad Bergbom and Joshua Butt. Both of these individuals testified that they did not recall any specific conversation between Greenfield and Richard Siegel surrounding the Release or its purported intent to bind Westgate.[17]

Greenfield admitted that she never knew or asked what type of entity "Westgate Resorts" was in order to insure that the correct organization was identified in the Release.[18] Perhaps not surprisingly, given that the document was first presented to Richard Siegel some four (4) years after this documentary project began, and only when the film was virtually completed,

---

12. *See* Release, attached hereto as Exhibit "C".
13. Deposition of Richard Siegel, attached hereto as Exhibit "D", p. 189.
14. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 29.
15. *See* Release, attached hereto as Exhibit "C".
16. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 35.
17. Deposition of Brad Bergbom, attached hereto as Exhibit "E", p. 15; Deposition of Joshua Butt, attached hereto as Exhibit "F", pp. 25-26.
18. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 29 ("I didn't even know there were different pieces of the company. We just called it Westgate Resorts").

Greenfield stated that the Release, the only document that Defendants contend obligates Westgate Resorts, Ltd. to binding arbitration, was not that important to her because "[i]t wasn't something that I thought we necessarily needed."[19] Tellingly, it was almost certainly the last document signed in connection with the film several years after the filming began.[20]

### D. The Authority of Richard Siegel to sign the Release on behalf of Westgate Resorts, Ltd.

David Siegel, the president of the Westgate Resorts organization, and its sole owner, testified that none of those denominated as "vice presidents" within the Westgate Resorts organization has the authority to sign any material contract or otherwise obligate the company without David Siegel's prior express authorization.[21] Specifically, he stated: "the vice president title is an honorary title and a designation so that people know how the chain of command works, but it doesn't give them authority. They can't open bank accounts without my signature. They can't sign checks. They can't do anything."[22] And, although Richard Siegel has signed several location, broker and ticketing agreements – all, in contrast to the draconian terms of the Release, intrinsic to the sales and marketing activities in which he was then engaged - these all were signed with David Siegel's prior express permission and authorization:[23] He testified "I'm the only one that has the authority to act for Westgate Resorts", Ltd. and "I have never given anyone, including Richard, the authority to act on behalf of Westgate Resorts," Ltd.[24] David Siegel stated that for the past 42 years he has "never ever given anyone authority to act for the company

---

19. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 47-48.
20. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp.12-13.
21. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 18.
22. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 18.
23. Deposition of David A. Siegel, attached hereto as Exhibit "A", pp. 18-20.
24. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 30.

without my approval"[25] and that Richard never asked him for permission to sign any documents in respect to the Film, something well outside the boundaries of the sales and marketing arena in which Richard Siegel was then operating.[26]

Greenfield testified that she did not ask David Siegel nor perform any due diligence, investigation or research prior to November 26, 2011 to determine whether Richard Siegel had authority to execute Westgate Resorts, Ltd. corporate documents, including the Release.[27] Furthermore, she testified that neither Richard Siegel nor David Siegel ever told her that Richard Siegel had the authority to sign corporate documents, such as the Release, on behalf of Westgate Resorts, Ltd.:

> Q. Did Richard Siegel ever tell you that he had the authority to sign corporate documents including releases on behalf of Westgate Resorts, Limited?
>
> A. He never said he had the authority.[28]

Other than transcripts of a conversation between Greenfield and David Siegel concerning the roles of his sons, Steven and Richard, in the company, Greenfield testified that she had no

---

25. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 32.
26. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 34.
27. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 35-36. To the extent that Defendants rely upon internet articles identifying Richard Siegel as a "vice president" of "Westgate Resorts", Plaintiff moves to strike the introduction of this evidence as hearsay and because Greenfield testified that she never did any due diligence to determine that Richard Siegel had the authority to execute the Release. *See* Exhibits 19-24 of Deposition of Richard Siegel, attached hereto as Exhibit "D"; *see also Dollar v. State,* 685 So.2d 901, 903 (Fla. 5th DCA 1996) ("A newspaper article, introduced to prove the truth of out of court statements contained therein, constitutes inadmissible hearsay."). In fact, one of the articles is dated October 16, 2012, which is after the Release was signed, conclusively proving that Greenfield did not and could not have relied upon it prior to the execution of the Release.
28. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 33.

.

other conversation with anyone that related to the roles of Richard Siegel in the company Westgate Resorts.[29]

> Q. Now just so I am clear, you don't - - you don't have any recollection of a conversation with David regarding the authority of Richard to execute contracts on behalf of Westgate Resorts?
>
> A. That's not something that we ever discussed, so it's not that I don't have a recollection, but we never discussed that. But we did - - David did say that he wanted Richard to go with me to Vegas, and Richard oversaw all of the filming that we did at Westgate Resorts, which began in January, 2010.[30]
>
> …
>
> Q. Well, what did [David Siegel] tell you about – other than telling you that you could film Richard and you could go to Las Vegas and interview Richard and meet with Richard, is it fair to say that you never had a discussion with David about Richard's authority to execute documents on behalf of Westgate?
>
> A. **I never had a discussion with David about anybody's authority to – to write the documents that they were – that they were signing.**[31]

Finally, Greenfield visited David Siegel a few days after the Release was signed by Richard Siegel but curiously never mentioned anything to David Siegel about the Release.[32]

**BURDEN OF PROOF UNDER § 4 OF THE FEDERAL ARBITRATION ACT**

Under Section 4 of the FAA, a party may seek an order compelling arbitration "under a written agreement for arbitration," and a court may make an order directing the parties to proceed to arbitration only upon "being satisfied that the making of the agreement for arbitration

---

29 Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 20.
30 Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p.22.
31 Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 26-27 (emphasis supplied).
32 Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp.27-28.

*. . . is not in issue*."[33] The party seeking to compel arbitration "bears the burden to prove the existence of the agreement."[34] When determining whether a valid arbitration agreement exists, courts apply the contract law of the particular state that governs the formation of contracts.[35] Thus, under Florida law the party seeking to compel arbitration bears the burden of establishing the existence of an agreement to arbitrate by a preponderance of the evidence, just as the party seeking relief under any other alleged contract has the burden of proving that contract's existence.[36] As a sister court held in *Schoendorf v. Toyota of Orlando,* No. 6:08–cv–767–Orl–19DAB, 2009 WL 1075991, at * 6 (M.D. Fla. 2009):

> To prove the existence of a contract [compelling arbitration] under Florida law, the party seeking to enforce the contract must prove "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver,* 875 So. 2d 375, 381 (Fla. 2004) (describing the "basic requirements of contract law"). The proponent of the contract must prove these elements by a ***preponderance of the evidence***. *Id.* (oral contract); *see also Robbie v. City of Miami, Fla.,* 469 So. 2d 1384, 1385 (Fla. 1985) (written contract). When one party is seeking to enforce a challenged agreement to arbitrate, "the [party] who should lose on the issue of an agreement to arbitrate is the one who failed to carry its burden of proving an acceptance of arbitration as a contractual remedy." *Steve Owren, Inc. v. Connolly,* 877 So. 2d 918, 920 (Fla. 4th DCA 2004) (citing *Shearson, Lehman, Hutton, Inc. v. Lifshutz,* 595 So. 2d 996, 997 (Fla. 4th DCA 1992)).[37]

---

33. 9 U.S.C. § 4 (emphasis supplied).
34. *Schoendorf v. Toyota of Orlando,* No. 6:08–cv–767–Orl–19DAB, 2009 WL 1075991, at *7 (M.D. Fla. 2009).
35. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) (explaining that courts generally apply ordinary state-law contract principles in deciding whether the parties have agreed to arbitration); *see also Granite Rock Co. v. Int'l Bhd of Teamsters*, 130 S. Ct. 2847, 2856 (2010) ("a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute" and to "satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce").
36. *Schoendorf v. Toyota of Orlando,* No. 6:08–cv–767–Orl–19DAB, 2009 WL 1075991, at * 6 (M.D. Fla. 2009).
37. *Id.* at *6 (emphasis supplied).

So, here, Defendants have the burden to prove that they made a contract with Westgate Resorts, Ltd. which requires that these disputes be arbitrated. So Defendants must proceed first and prove a *prima facie* case, by a preponderance of the evidence, that an agreement to arbitrate between Westgate Resorts, Ltd. and Defendants exists. Failing that, Westgate Resorts, Ltd. has no obligation to rebut facially insufficient evidence of the making of an arbitration agreement. But regardless, the evidence is clear: not agreement to arbitrate exists and Defendants' Motion to Stay must be denied.

## MEMORANDUM OF POINTS AND AUTHORITY

### I.   RICHARD SIEGEL DID NOT HAVE ACTUAL AUTHORITY TO BIND WESTGATE

While a signed arbitration agreement leaves a court with no choice but to compel arbitration, ***this proposition applies only if the individuals who signed the agreement are legally authorized to bind the respective parties***."[38] Here, it is evident that Richard Siegel, who can be, at most, only an agent of his employer (now, Westgate Marketing, LLC), was not the agent of Westgate Resorts, Ltd, either express or implied, and was without the authority to bind Westgate.

For actual authority to exist such that the principal is bound, there must be an agency relationship, which requires: (1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent.[39] Richard Siegel did not have express authority to sign the Release because,

---

38.   *Smith Wilson Co. v. Trading and Development Establishment*, 744 F.Supp. 14, 16 (D.D.C. 1990).
39.   *See Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003).

9

.

as both Richard Siegel and David Siegel testified, Richard Siegel did not have any authority to bind Westgate Resorts, Ltd. at any point in time.[40]

Moreover, while the Release is signed by Richard Siegel, no title is indicated, nor is there any indication that Richard Siegel is signing in any representative capacity.[41] A contract which on its face appears to be that of a corporation, but signed only with the name of an individual is not binding on the corporation in the absence of evidence to the contrary.[42] Here, even if the Release had actually stated "Westgate Resorts" at top prior to Richard Siegel's signature like Greenfield claims, there was no title next to Richard Siegel's name. Therefore, since Richard Siegel is not an officer of Westgate[43] and the Release does not purport that he is, there is absolutely no basis for concluding that the Release is binding as to Westgate.

In sum, it is clear that Richard Siegel did not have actual authority to bind Westgate Resorts, Ltd. Besides the testimony from both Richard Siegel and David Siegel that Richard Siegel has never had the authority to bind Westgate Resorts, Ltd., Richard Siegel's own actions support this testimony. Richard Siegel never signed any documents binding Westgate Resorts,

---

40. *See* Deposition of Richard Siegel, attached hereto as Exhibit "D", p. 207; *see* Deposition of David A. Siegel, attached hereto as Exhibit "A", pp.30, 34.
41. *See* Deposition of Richard Siegel, attached hereto as Exhibit "D", p.189; Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 32.
42. *Bellaire Sec. Corp. v. Brown,* 168 So. 625, 636 (Fla. 1936) ("According to the strict common-law rule, in order to bind a principal by a contract under seal, as this one was, the instrument must profess to bind the principal, and it must be executed in his name and as his deed or contract. If it purports to be executed as the instrument of the agent and under his individual signature and seal, it is not binding on the undisclosed principal, even though the other party to the instrument actually knows the principal and that the agent is contracting for him. And the rule is a familiar one that the authority of an agent cannot be established merely by proof of his own declarations made to a third party, in the absence of the principal."); *see also Coyle v. Smith*, 300 So. 2d 738, 739 (Fla. 4th DCA 1974) (there were jury issues as to the existence of an agency relationship between the parents and their son, and if the relationship existed, whether the son was acting within the scope of his real or apparent authority).
43. *See* Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 10.

.

Ltd., and in the ordinary course of his employment with Westgate Marketing, LLC he only signed marketing, ticketing and broker agreements on behalf of his employer with David Siegel's prior express authority and consent.[44] For these reasons, Richard Siegel did not have actual authority to sign the Release on behalf of Westgate.

## II. RICHARD SIEGEL DID NOT HAVE APPARENT AUTHORITY TO BIND WESTGATE[45]

In addition to not having the actual authority to bind Westgate, Richard Siegel similarly did not have the apparent authority to bind Westgate.[46] Apparent agency exists only if all three of the following elements are present: (1) a representation by the ***purported principal*** that the agent is authorized to act on behalf of the principal; (2) a good-faith reliance on that representation by a third party; and (3) a change in position by the third party who suffers a detriment in reliance on the representation.[47] The critical issue in the analysis is not the subjective belief by the third party that the agent had the authority to act on the principal's

---

44. *See* Deposition of Richard Siegel, attached hereto as Exhibit "D", pp.118, 138; *see also* Deposition of David A. Siegel, attached hereto as Exhibit "A", pp. 20-21.

45. Florida law equates apparent authority with the doctrine of agency by estoppel. *See State, Dept. of Transp. v. Heckman,* 644 So. 2d 527, 529 (Fla. 4th DCA 1994) ("The doctrine of agency by estoppel is similar to the doctrine of apparent authority such that there is no significant difference between them. In order to hold the principal liable it must be established (1) that the principal manifested a representation of the agent's authority or knowingly allowed the agent to assume such authority; (2) that the third person in good faith relied upon such representation; and (3) that relying upon such representation such third person has changed his position to his detriment.").

46. Even if this Court were to find that Richard Siegel had actual or apparent authority to bind Westgate Resorts, Ltd., the Release, which must still be viewed in terms of all traditional contract principles, is still invalid because the evidence will show it was given without consideration (as, among other things, the film, at the time, was virtually completed) and therefore no agreement was ever formed.

47. *Amstar Ins. Co. v. Cadet*, 862 So. 2d 736, 741 (Fla. 5th DCA 2003); *Roessler v. Novak*, 858 So. 2d 1158, 1161-62 (Fla. 2d DCA 2003); *Ramos v. Preferred Medical Plan, Inc.,* 842 So. 2d 1006, 1008 (Fla. 3d DCA 2003); *Carolina-Georgia Carpet & Textiles, Inc. v. Pelloni*, 370 So. 2d 450, 451 (Fla. 4th DCA 1979).

11

.

behalf, but rather, off an objective manifestation by the ***principal*** to the third party that the agent has authority to act on his behalf.[48] Thus, the principal must take some affirmative act to imply to the third-party the agent has authority, or the principal must later ratify an act performed by the agent.[49]

In *National Auto Lenders, Inc. v. Syslocate, Inc.*,[50] the Southern District of Florida denied a motion to compel arbitration because it found that the agreement was signed by individuals who did not have authority to bind the plaintiff to arbitration, and that despite their own actions which may superficially have created an appearance of apparent authority, it was only the actions of the actual principal that could create such apparent authority.[51] As a result, the Court held that no agreement to arbitrate existed, even though the signatories to the agreement – ***in stark contrast to Richard Siegel's words and conduct here*** – told the defendant that they had the authority to bind the principal. The Court reiterated that: "[t]he reliance of a third party on the apparent authority of the principal's agent must be reasonable and *rest in the actions of or appearances created by the principal* ... and not by agents who often ingeniously create an appearance of authority by their own acts." (*e.s.*)[52]

What the Court found missing in *National Auto Lenders* is likewise missing here. Greenfield admitted that David Siegel, for himself and for Westgate, never told her or even made the slightest intimation that Richard Siegel had any authority to sign contracts for Westgate Resorts, Ltd., much less a contract that purports to release legal claims that had not, to the

---

48. *See Knighten v. Palisades Collections, LLC*, 721 F. Supp. 2d 1261, 1267 (S.D. Fla. 2010).
49. *Roessler,* 858 So. 2d at 1162.
50. 686 F.Supp.2d 1318 (S.D. Fla.)
51. *See National Auto Lenders, Inc.*, at 1322.
52. *Id.*

.

knowledge of David Siegel, even arisen as of November, 2011. As such, Defendants cannot claim they "thought" Richard Siegel was Westgate Resorts, Ltd.'s agent, as, according to Greenfield herself, no-one had ever suggested that such was the case. More importantly, Defendants cannot portray the actions of Richard Siegel – especially those attributed to him by others in materials not even elevated to the level of rank hearsay – as something upon which they relied to impute the "apparent authority", as, first, Greenfield's testimony refutes this, and second, and most importantly, that authority may only come from the words and actions of David Siegel as principal, and that never occurred. Finally, there can be no ratification of Richard Siegel's signing of the Release because David Siegel never learned about it until this litigation began and the Motion to Stay was filed.[53] Greenfield certainly had the opportunity to do so, as she visited David Siegel a few days after Richard Siegel signed the Release, but never mentioned it to David Siegel at all.[54]

### III.  CONCLUSION

For the reasons set forth above, it is clear that Westgate Resorts made no agreement to arbitrate. As a result, the Motion to Stay should be denied and Defendants should be directed to respond to the Amended Complaint.

Respectfully submitted this 29th day of November, 2012.

*/s/ Richard W. Epstein*
RICHARD W. EPSTEIN, ESQ.
Florida Bar No. 229091
Richard.Epstein@gmlaw.com
REBECCA F. BRATTER, ESQ.
Florida Bar No. 685100
Rebecca.Bratter@gmlaw.com
MARY B.CLARK, ESQ

---

53. Deposition of David A. Siegel, attached hereto as Exhibit "A", p. 35.
54. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp.27-28.

*Westgate's Pre-Hearing Memorandum*
Case No. 6:12-cv-ORL-18-GJK

Florida Bar No. 30178
Mary.Clark@gmlaw.com
GREENSPOON MARDER, P.A.
200 East Broward Boulevard, Suite 1500
Fort Lauderdale, Florida 33301
Telephone No. (954) 491-1120
Facsimile No. (954) 343-6958

MICHAEL MARDER, ESQ.
Florida Bar No. 251887
Michael.Marder@gmlaw.com
KATHRYN SAFT, ESQ.
Florida Bar No. 041069
Kate.Saft@gmlaw.com
GREENSPOON MARDER, P.A.
Capital Plaza I
201 East Pine Street, Suite 500
Orlando, Florida 32801
Telephone No. (407) 425-6559
Facsimile No. (407) 422-6583

*Attorneys for Westgate Resorts, Ltd.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification per service list attached on this 29th day of November, 2012.

*/s/ Richard W. Epstein*
RICHARD W. EPSTEIN

9593192 v2

.