IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

------------------------------------------------------------------------------x
WESTGATE RESORTS, LTD.,
a Florida limited partnership,

                       Plaintiff,                     CASE NO.: 6:12-cv-35-ORL-18-GJK

        -against-

LAUREN GREENFIELD, an individual,
FRANK EVERS, an individual, and
GREENFIELD/EVERS LLC d/b/a Evergreen Pictures,

                       Defendants.
------------------------------------------------------------------------------x

**DEFENDANTS' POST-EVIDENTIARY HEARING MEMORANDUM
OF POINTS AND AUTHORITIES
SUBMITTED IN FURTHER SUPPORT OF THE MOTION
TO STAY THE ACTION PENDING ARBITRATION**

## I.                 PROCEDURAL HISTORY

Defendants Lauren Greenfield ("Greenfield"), Frank Evers ("Evers") and Greenfield/Evers, LLC d/b/a Evergreen Pictures (the "Production Entity") (collectively "Defendants") previously moved to stay the action pending arbitration, on the basis that all claims asserted by Plaintiff Westgate Resorts, Ltd. ("Westgate Resorts") are encompassed by a valid and enforceable binding arbitration provision contained within a release signed by Westgate Resorts.  [DE 30].  In opposition, Westgate Resorts asserted primarily that Richard Siegel, who signed the release, had no authority to do so.  [DE 43].  In response to Defendants' motion, the District Court ordered an Evidentiary Hearing to determine whether an agreement to arbitrate was made (and granted limited discovery as to those facts bearing on that issue).  [DE 48].  The Hearing was conducted on December 3, 2102.  [DE 75: hereinafter "Hearing Transcr."].

**A.      The Deposition Transcripts of David Siegel, Richard Siegel, Lauren Greenfield, and the DVD of the Film Were Admitted into Evidence at the Evidentiary Hearing.**

A source of confusion arose before the litigants received the Evidentiary Hearing transcript concerning the admission into evidence at the Evidentiary Hearing of (i) the deposition transcripts and exhibits thereto of David Siegel, Richard Siegel and Lauren Greenfield and (ii) the DVD of the film itself.   We were advised by the Courtroom Deputy Clerk that the depositions were not moved into evidence.   However, there were several exchanges made at the Evidentiary Hearing, during which it was made clear that they were admitted into evidence.

1.   Specifically, during Defense counsel's opening remarks, the first exchange on the issue was as follows:

> Mr. Garbus: Given the fact that it's a bench trial, if you want, **we can put the depositions in to read them**—
> Court: Actually it's just an evidentiary hearing on you defense, but **to save time, I can read the depositions later and watch the film later**.
> Mr. Garbus: that's what I thought.
> Court: I assume everyone else has seen it.
> Mr. Garbus: I think that would be a very good way to deal with it.

Hearing Transcr. at 5 [lines 6-13].

2.   The second exchange on the issue was as follows:

> Mr. Garbus: **As Exhibit 30, we have the final transcript of the film. I'll move it into evidence**.
> Mr. Epstein: Your Honor, this is what I mentioned before, that subject for an opportunity to review it, since we haven't had that chance before --
> Court: All right.
> Mr. Epstein: **-- we don't have any objection to its admissibility**.
> Mr. Garbus: and **30A is the actual DVD itself of the film**.
> Mr. Epstein: This is the actual film?
> Mr. Garbus: Yes.
> Mr. Epstein: and it's 43?
> Mr. Garbus: **It's 30A**.
> Mr. Epstein: Three zero A, okay.
> Court: Mr. Epstein, I'll give you until December 10th to file anything that you think is relevant as to that Exhibit 30.

Hearing Transcr. at 86 [line 24] – 87 [line 16].

3.  The third exchange on the issue was as follows:

        (Recess.)

Court: Do you have any other witnesses?

Mr.Garbus: Your Honor, the way we worked it out is I think he's going to put on two Siegels. I will then cross-examine them, if -— if your understanding is that on cross I can go beyond direct. Otherwise I will put them on. But he and I--

Court: All right. Well--

Mr. Garbus: If it --

Court: Okay. Well ——

Mr. Garbus: **I put in all those depositions and the exhibits which are all marked**.

Court: Okay. Well, why don't you go ahead and put in whatever you want and we will conclude. Unless well, no, we started at 1:30. It's 1:35. It's a nonjury case. We'll just -— you put in whatever evidence you want, and if they're not here by the time you're `finished`, then we'll be done.

Mr. Johnson: Well, I wanted to file -— more of a question, but **I have binder of all the deposition exhibits that were marked during depositions, and they're in numerical order from 1 to 41. Problem is we already used some of those prior numbers. I wonder if we just added if we just add a dash A**--

Court: **All right**.

Mr. Johnson: then we would save a lot of time for everyone. Thank you.

Mr. Garbus: **So we will mark as Exhibit 71 the deposition of David Siegel; 72, the Volume 1 of the deposition of Richard Siegel; and as 73, the deposition of Richard Siegel Volume 2. I will then also put in a binder. The binder has the exhibits that are part of the depositions.** And we have the binder and a book. And each of the exhibits has its own exhibit number. Given the fact that we previously used in court 1, 2 serial numbers, I thought with respect to these we would call it Al, A2, A3, and A4, and we will mark it so as to differentiate it from the exhibits that were marked this morning. And I will, of course, give a set of these papers to counsel when he comes in.

Mr. Johnson: I need 30 seconds.

Mr. Garbus: So I will give you — ma'am, I will give you something that is properly identified so as Al, A2,A3.

        (Mr. Epstein entered the courtroom.)

Court: Mr. Epstein?

MR. EPSTEIN:    I apologize.

COURT:   We started at 1:30. **He's introduced exhibits**.

MR. GARBUS:    **I put in namely the depositions and a volume with all the exhibits**.

MR. EPSTEIN:    **Which depositions?**

MR. GARBUS:    **The -— both Siegels, Richard and David.**

MR. EPSTEIN:    Your Honor, we have discussed --there are certain of the exhibits in ——~ and **a little bit of the questioning in Richard Siegel's deposition to which we have objections.** So logistically I'm not sure the best way to deal with it.  I guess it kind of prompts the question: What is the Court's preference with respect to legal arguments at the

conclusion of this? Are you going to request written memoranda? If so, we can address it in that fashion?

THE COURT:      All right. **We'll do written memoranda**.

MR. EPSTEIN:      Okay. **We can just address the objections to these**.

THE COURT:      All right.

MR. EPSTEIN:      They're pretty technical, they're, you know —— and —— and fairly easy to articulate —-

THE COURT:      Okay.

MR. EPSTEIN:      —— so we should be able to —— that will probably be the best way. The testimony less so. It's just rather than duplicate six hours of testimony here today, we're obviously looking to expedite this to the extent that it's possible –

THE COURT: Okay.

MR. EPSTEIN:      —— to do so. **And we have no objection** --— **Mr. Siegel is the 30(b) (6) or effectively the 30(b) (6).**

THE COURT:      **Which Mr. Siegel?**

MR. EPSTEIN:      **David Siegel. David Siegel. Richard Siegel is the one with the —— with which we've got a couple of issues regarding some of the exhibits**. **And did you offer Ms. Greenfield's**?

MR. GARBUS:      I don't know that there are any other exhibits that I have not offered for Ms. Greenfield.

MR. EPSTEIN:      No. No. Her deposition, is that ——

MR. GARBUS: **I did not offer that. If you want that, we'll put it in**.

MR. EPSTEIN:      Okay. **Why don't we go ahead and do that**. Because we can play it, but if we have a transcript, we have a video and –

THE COURT: All right. well, you had a full opportunity to cross-examine her so...

MR. EPSTEIN:      Yeah, exactly. Right. But she's a party, so...

THE COURT:      **All right**, whatever.

Hearing Transcr. at 127 [line 10] – 131 [line 7].

In the of the foregoing exchanges, the depositions of David Siegel and Defendant Lauren Greenfield are being relied upon pursuant to FRCP 32(a)(1), and the deposition of Richard Siegel is being relied upon pursuant to FRCP 32(a)(2).

**II.** <u>**PRELIMINARY STATEMENT**</u>

The Court can either believe its own observations, the signed documents in the case, the history of the parties and facts and circumstances of the case, or the blatant lies and contradictions of David and Richard Siegel.  The claim that Lauren Greenfield's work was unauthorized or beyond the limits of what Westgate Resorts knew and permitted is incredible on

its face.  The "unauthorized interviews" and the "unauthorized agreement to arbitrate" were authorized.  The two series of events are inextricably intertwined.  David and Richard Siegel both authorized the making of the film and the giving of the Westgate Resorts release, and hundreds of people were aware of it.

Every person at Westgate Resorts made themselves available to Lauren Greenfield.  It was not only Richard Siegel who opened the doors to all the work that she was going to do.  Ms. Greenfield was led into back office spaces where she met with dozens of employees and was welcomed and authorized to photograph and talk to people at numerous different sites and two different states over more than a two year period.  It is not just the testimony of David Siegel as to Westgate Resorts's authorization of Lauren Greenfield's work.  There were dozens of other people from Westgate Resorts who made it possible.

David Siegel's view that he knew what was going on in every detail of the company and every detail of every contract that was ever signed was contradicted by the fact that the person closest to him -- Richard Siegel -- had an adjoining office right next to him (Hearing Transcr. at 44 [line 23] – 45 [line4]) and was available to Lauren on a daily basis.  Yet David claims he was unaware.

It is not just a question of what David or Richard say, it is the uncontradicted conduct as testified to by Lauren Greenfield and as shown in the film itself and in the videotaped interviews, transcribed and admitted into evidence.  Indeed, documents produced by Westgate Resorts during discovery, deposition testimony of David and Richard Siegel and on camera interviews with David and Richard Siegel prove that Richard Siegel had real and apparent authority to sign the "Westgate Resorts Release", dated November 26, 2011.  Defense Exh. 25, 39a. The Siegels' attempt to avoid the consequences of the Westgate Resorts Release is disingenuous, at best.

David and Richard Siegel contradict each other on essential issues.  Nevertheless, the proof shows that Richard Siegel had real and apparent authority to deal with every aspect of Defendant Lauren Greenfield's filming, personally making Westgate Resorts' physical offices, call centers, sales floors, resorts and meetings and activities available to her for filming, as well as signing documents -- the Westgate Resorts Release and other releases -- without objection, to ensure that filming could continue and the film was completed.

III.         **THE TESTIMONY AND EVIDENCE ADDUCED
AT THE EVIDENTIARY HEARING AND DEPOSITIONS
ESTABLISHES RICHARD SIEGEL'S REAL AND APPARENT AUTHORITY
TO SIGN THE RELEASE CONTAINING AN ARBITRATION CLAUSE**

A.    **The Siegels' Testimony at the Evidentiary Hearing was Incredible: The Facts and
Circumstances Establish that Richard Siegel clearly acted with Real and
Apparent Authority from David Siegel**

Scores of Westgate Resort employees, perhaps hundreds, collaborated with Richard and David Siegel to work with Lauren Greenfield to get the film shot.  The film itself and the uncontradicted testimony shows this unequivocally: access to buildings and scores of Westgate Resort employees at sales meetings, directors meetings and interviews in Florida, Nevada, and New York.  Dozens of Westgate Resort employees signed releases, all with arbitration clauses.

It is a flat out lie that David knew nothing about or that he did not authorize the filming or the signing of arbitration clauses.  His office adjoined Richard's office.  Hearing Transcr. at 44 [line 23] – 45 [line4].  His secretary worked with Richard and Lauren Greenfield to get the interviews.  Id. at 41 [lines 3-12].

If David's testimony were to be believed, scores of Westgate Resorts employees, perhaps hundreds, were letting Greenfield film their activities at work -- including signing releases (with arbitration clauses) permitting the filming and use of that film in a movie -- that he knew nothing about.  Compare this with his testimony that all 7000 Westgate Resorts employees knew,

6

because he told them, that they could not sign any documents.  <u>Hearing Transcr.</u> at 220 [line 17]

– 221 [line 3].  This testimony is absurd – how can a time-share enterprise operate when no one

can sign any documents?  And how could over 200 personal releases be signed after shooting

company activities if David did not give authority – real or apparent – to Richard?  The content

of the film is the best evidence that David is lying.  <u>Defense Exh.</u> 30a  -- admitted into evidence

at <u>Hearing Transcr.</u> at 87 [lines 1-17].  Compare his testimony with the film itself that shows the

Westgate Resort employees cooperating in order to shoot in three states, at a variety of Westgate

Resort sites , with scores of prospective customers, all of whom signed agreements to arbitrate

and releases.

Richard described the vast sales and marketing teams, hundreds of employees that he

supervised.  <u>Hearing Transcr.</u> at 158 [line19] – 159 [line 15].  In working with him and Lauren

and David, all these employees believed that they were carrying out the Westgate Resorts

mission to create a film that David unequivocally wanted.  Everything changed, as David admits,

after he saw the film (<u>Hearing Transcr.</u> at 246 [lines 15-20]), a film that occupied two years of

Lauren Greenfield's time and dedication, her mother's money and hundreds of thousands from

investors.  <u>Hearing Transcr.</u> at 58 [lines 11-15].  David decided he did not like how he was

portrayed.  But that is not a legal basis for disregarding a validly signed release requiring

arbitration.

**B.**     **Filmed Interviews of David and Richard Siegel Prove Richard Siegel Had Real and Apparent Authority To Sign The Release**

The filming of "The Queen of Versailles" (the "Documentary") took place from March

2009 through the end of November 2011.  During such filming, the Production Entity filmed

several interviews with both David Siegel, the President and CEO of Westgate Resorts, and his

son Richard Siegel, concerning Richard's title, role and responsibilities at Westgate Resorts.

They prove that Richard Siegel had significant responsibilities and authority as a Director of Sales and Vice President of Westgate Resorts, having been held out as such by both David and Richard.

On January 30, 2010, both David and Richard Siegel were interviewed on camera for the Documentary at the Las Vegas resort known as "PH Towers Westgate".

David Siegel was asked by Greenfield: "[w]e met your son Richard, what was his role in this?"  [Defense Exh. 11].  David Siegel replied:

> My son Richard is the **Director of sales**, here in Las Vegas, as well as in Gatlinburg and Myrtle Beach. **He wears a lot of hats in the company**. He also runs telesales and customer service back in Orlando as well."  Id. [emphasis added].

When Greenfield asked Richard Siegel "[w]**hat's your job here at Westgate**?", he said:

> T]o make David Siegel a lot of money. **I'm also Vice President**, with no other title attached as Vice President, because he didn't know what to do with me, but since everyone else seemed to be a vice president, he was like oh, okay, you're a vice president too."

[Defense Exh. 12] [emphasis added].

In talking about his responsibilities at PH Towers Westgate, Richard said:

> …**I was expanding my role in the company**, taking on other resorts throughout the company, and doing better than the rest of the company in sales and marketing and so on, and so when the opportunity arose, and my father asked me if I wanted to come take over this project, and so a little over a year ago, I officially took it over, and **now I'm in charge of everything out here.** Id. [emphasis added].

Later, when asked by Greenfield "[a]re you David's right hand in the company?", Richard Siegel replied:

> "….I control up to 50% of the sales in the company, and **I have 14 other departments throughout the entire company**, so I'm definitely not his right hand, **he has about seven executives and I'm just one of them**, but I do a lot of the work." Id. [emphasis added]

On August 30, 2011, David Siegel again confirmed to Greenfield -- when asked "what do [his sons] do in the company" -- that:

> Well both **my sons have leadership roles in the sales department**. My son Steve runs all the Orlando sales and **my son Richard runs all the sales outside of Orlando**. They're doing a good job and not because they're my sons. They're in the position they're in because they just happen to be the best at what they do. And when they first started with me at work you're employees at home you're my sons. But at work you'll rise as to your abilities and **they both rose to the top**. So I'm happy about that. And they're doing a great job.

[<u>Defense Exh.</u> 20] [emphasis added].

On April 28, 2011, Richard Siegel again confirmed:

> I'm over-**all of the properties outside of Florida report to me now**, not just the dayline. I handle the front line, the in-house, the marketing, the operations, the customer service. All of that reports to me, so I travel quite a bit, but I have nothing to do with any sales in Orlando other than telesales **I'm in charge of, and of course, about another 14 departments** including collections, pending to good, owner relations, asset recovery, the Now team, mail out document management, contract processing, deeding and so on.

[<u>Defense Exh.</u> 17] [emphasis added].

David Siegel and Richard Siegel were clear and consistent. At no time did either David or Richard Siegel say that Richard did not work for Westgate Resorts -- they said expressly the opposite -- or that Richard had no authority to bind Westgate Resorts, as they now contend. To the contrary, Greenfield and the Production Entity were reasonably relying on the statements made directly to Greenfield by David and Richard Siegel themselves, detailing Richard's significant responsibilities and authority as a Director of Sales and Vice President at Westgate Resorts and one of about seven top executives. Westgate Marketing LLC was never mentioned.

**C.      David Siegel's Deposition Testimony And Hearing Testimony, Past And Present Westgate Documents Prove Richard Had Real And Apparent Authority To Sign The Release on Behalf Of Westgate Resorts: His Attempt To Shuffle Richard To Other Corporate Entities For His Advantage Is Unavailing**

David Siegel gave deposition testimony, in addition to testifying at the Evidentiary Hearing.  [Defense Exh. 71: "D.Siegel Transcr."].  What is abundantly clear from David Siegel's testimony is that David knew Richard was overseeing and authorizing the filming of Westgate Resorts company activities on site and Richard became the primary liaison between Westgate Resorts and the Production Entity for actual filming, handling all material matters and signing documents, because Richard had such authority.

In discussing the executive management staff for the Westgate timeshare enterprise, David Siegel said that Richard Siegel is part of the executive team.  D.Siegel Transcr. at 10 [lines 5-9]   David said that Richard was one of about a dozen Vice Presidents in the Westgate timeshare enterprise.  Id. at 16 [lines 19-23].[1]

Despite claiming he exercised complete control over Westgate Resorts and all its contracts, David was unable, at his deposition, to even identify which Westgate company entered into the agreements associated with its ticketing business.  D.Siegel Transcr. at 20 [lines 9] – 22 [line 6].  In point of fact, Richard had signed several ticketing contracts on behalf of Westgate Resorts.  Defense Exhs. 25a-31a.  David did not recall specifically giving Richard prior express

---

[1] David Siegel admitted that, when referring to employees, he does not distinguish between Westgate Resorts and its various subsidiaries and affiliates which form the timeshare enterprise.  D.Siegel Transcr. at 11 [lines 17-25].  He refers to them as "employed by Westgate."   Id. at 12 [lines 5-6].   The employees themselves also just say "Westgate" when asked who they work for, regardless of the company they are technically employed by.  Id. at 11 [17-20].  The various companies comprising the Westgate timeshare enterprise are treated as "one big family."  Id. at 12 [lines 10-22]. David said "as far as I'm concerned, they all work for me."  Hearing Transcr. at 219 [line 25] – 220 [line 3].

approval to sign them.  D.Siegel Transcr. at 22 [lines 3-6].  It shows that Richard had more authority than David was willing to admit.[2]

Nor did David even have personal knowledge as to Richard's technical employer -- while he testified that Richard was employed by Westgate Marketing, when he was asked how he knew that, he said "[b]ecause I was told that."  Id. at 23 [lines 9-13].  Despite Richard's purported employment by Westgate Marketing, David admitted he could give Richard the authority to act on behalf of Westgate Resorts if he so chose (id. at 30 [lines 5-18]; Hearing Transcr. at 217 [lines 9-22]), which he has done here.

David's hearing testimony materially conflicted with his deposition testimony as to what he knew during filming concerning what Richard was doing and permitting in respect of filming. At his deposition, David admitted that he was aware before and during filming that Richard was (i) giving interviews for the Documentary and (ii) giving the filmmakers access to Westgate Resort facilities in both Las Vegas and Orlando.  D.Siegel Transcr. at 32 [line 25] – 33 [lines 1-16].   At the hearing, David denied knowing that Richard had been giving interviews or permitting company activities to be filmed.  Hearing Transcr. at 224 [line 17] – 225 [line12]; 233 [line 22] -234 [line 24].  It was a patent attempt by David to back away from what was obvious – he knew generally what was going on and had given Richard authority to handle matters as Richard deemed appropriate.

David's testimony became preposterous at the hearing, as he tried to further distance himself from admitting his degree of knowledge of what filming had occurred.  He claimed that "other than showing [Greenfield] the building, that was the only thing that I authorized."

---

[2] Lauren Greenfield also testified at the Evidentiary Hearing about a materials release she obtained from Jon Kleckner, the Head of Creative Services for Westgate.  Hearing Transcr. at 30 [lines 8-21].  Kleckner's signing of a release -- just like Richard's signing of various company releases -- runs directly counter to David Siegel's claim that he alone had authority over the signing of every document.  It shows that others had more authority than David was willing to admit.

Hearing Transcr. at 226 [line 6-7].  David later admitted that he knew Greenfield was filming at different properties and talking to people, including his sons Richard and Steve -- he just claimed that he thought she was filming the facilities -- the landscaping, the operation, but not interviewing his employees.  Hearing Transcr. at 231 [line 18] – 232 [line18].  Obviously, it would not be much of a documentary if all Greenfield filmed were physical structures.  David knew that more than that was being filmed.

David essentially threw Richard under the bus -- disclaiming knowledge of or authorization over almost everything that Richard permitted to be filmed.  Hearing Transcr. at 235 [line 5] – 238 [line 24].  Of course, this flies in the face of common sense – and the fact that Greenfield obtained over 200 releases (through the help of Richard) from employees and prospective customers as a result of the various shoots.

It is preposterous for David to try to disclaim knowledge of or authorization for the filmings at issue.  Richard testified at his deposition that "I had to get permission for almost everything."  Defense Exh. 73: "R.Siegel Transcr.", Volume II at 170.  David essentially said both Richard and Jackie Siegel had been lying to him about what was being filmed for over two years.  Hearing Transcr. at 243 [line 20] – 244 [line 21].  This testimony is wholly lacking in credibility.

David knew Richard was acting as the Westgate Resorts officer in charge, because he told him to do so.  Indeed, David did not recall having any conversation with the filmmakers about what Richard should or should not be doing in terms of assisting them or otherwise.  D.Siegel Transcr. at 37 [lines 7-13].  They were led by the hand by David to Richard, to deal with Richard in regard to filming company shoots.

Everyone at Westgate Resorts, including both Siegels, saw Lauren Greenfield and her colleagues arrive to do shootings in the offices, sales floors and resorts -- she came with cameramen, soundmen and production assistants, a small team of people.  There is no way this crowd could move around within Westgate Resorts locked offices and confidential sales meetings without being fully authorized to go in.  David's testimony just does not make any sense.

But David did truthfully admit that he could have instructed Richard to cease all interaction with the filmmakers and prevent them from coming on site to film activities.  D.Siegel Transcr. at 35 [lines 8-14].  But David chose not to because he wanted the film -- he testified that (x) he never told Richard what Richard could or could not permit the filmmakers to do, or what Richard could or could not say during his interviews, and (y) Richard never asked for permission from him to do anything in any way.  Id. at 33 [lines 17-25] – 34 [lines 1-13].  Richard had been given *carte blanche* to do as was necessary in his discretion.

**D.**     **Richard Siegel's Hearing Testimony and Deposition Testimony, His Conduct, And Westgate Resorts Documents Signed By Richard Siegel Prove He Had Both Real and Apparent Authority To Sign The Release on Behalf Of Westgate Resorts**

Richard Siegel gave a deposition in addition to his hearing testimony. [Defense Exhs. 72 and 73: "R.Siegel Transcr.", Volumes I and II].  His testimony is fundamentally consistent with the testimony of Lauren Greenfield in the material respects.  He was a Vice President and part of the executive management team, and acted in accordance with his scope of authority in overseeing, supervising and authorizing filming and signing necessary documents on behalf of Westgate Resorts without asking David for permission.  However, his testimony at the Evidentiary Hearing was riddled with inconsistencies, as was his deposition testimony.  He showed himself to be wholly lacking in credibility.

Richard Siegel said that Westgate Marketing does sales and marketing for Westgate Resorts, and that he was an employee of Westgate Marketing.  R.Siegel Transcr., Vol. I, at 7 [lines 8-10], 9 [lines 8-9].  But as to his authority to act on behalf of Westgate Resorts, that was belied by his business card -- in use in November 2011 -- which has a "Westgate Resorts" and "CFI" logo and does not state "Westgate Marketing" anywhere on it.  Defense Exh. 1a.  But it does state that he is Vice President.  Hearing Transcr. at 159 [line 18] – 161 [6],[3] R.Siegel Transcr., Vol. I, at 5-7.[4]

Richard Siegel confirmed that he was on the Westgate Resorts executive team.  R.Siegel Transcr., Vol. I, at 50 [lines 5-6].  He also confirmed that as of 2011, he was responsible for several different departments across the Westgate enterprise (some of which might not be not operated by Westgate Marketing).  Id. at 32 [line 17] – 33 [line 2], 46 [lines 20-24], 142 [line 20] – 143 [lines 1-16].

Richard Siegel ultimately admitted that he had, in fact, signed several contracts on behalf of Westgate Resorts.  Hearing Transcr. at 162 [line 15] – 163 [line 20].  His explanation was that each time "Westgate Resorts" had been filled in improperly, and that they are usually filled in after he signs them.  Id. at 164 [line 4] – 165 [line 13]; see Defense Exhs. 25a-31a.  His testimony was, in essence, that there were a lot of people out there putting the name "Westgate

---

[3] Richard Siegel's claim that his business cards were created before Westgate Marketing was formed – as his explanation for why they said "Vice President – Westgate Resorts" -- is risible. Before then, he claims to have worked for another affiliate, CFI Sales and Marketing.  Hearing Transcr. at 132 [lines 3-18].  Given Richard Siegel's reasoning, the "old" cards should have said CFI Sales and Marketing.

[4] Richard admitted that Westgate Marketing does not have its own email address, that his email address is at Westgate Resorts.  Hearing Transcr. at 180 [lines 6-19].  He claimed not to even know whether Westgate Marketing even had its own phone numbers.  Id. at 180 [lines 20-25].  Westgate Resorts also produced numerous documents, indicating that Richard Siegel had been hired by Westgate Resorts.  Defense Exhs. 2a-5a, 9a-13a.  Richard Siegel testified that his office was in an office building that had a CFI logo on the top of the building, and a Westgate Resorts logo on the floor where his office is located.  R.Siegel Transcr., Vol. I, at 12 [line 16] – 13 [line 18].  He did not know whether there was any Westgate Marketing logo or Westgate Marketing receptionist there, as there is only a single receptionist.  Id.  He admitted that there was no sign in Las Vegas that said Westgate Marketing.  Hearing Transcr. at 184 [lines 11-18].  He also admitted not ever having seen a piece of stationary saying "Westgate Marketing."  Hearing Transcr. at 182 [lines 8-15].

Resorts" onto documents after he signed them in blank (Hearing Transcr. at 188 [lines 3-9], 190 [lines 1-20]) -- just like he now claims Lauren Greenfield did with respect to the "Westgate Resorts Release", dated November 26, 2011 (upon which is based Defendants' motion to stay the action pending arbitration).  It is very convenient testimony.

Indeed, when it came to the Declaration that Richard Siegel signed in this action (in opposition to Defendant's motion for a stay), he astoundingly admitted that he may not have even read it before he signed it.  Hearing Transcr. at 166 [line 12] – 167 [line 7].  It is but of a piece of his entire testimony – claiming to have signed a document under penalty of perjury and other legally binding documents and thereafter claiming he never read them, did not remember signing them, and did not understand what he was signing in any event.  Richard Siegel cannot have it both ways.  His testimony is simply self-serving and lacks any credibility.

When it came to the Documentary, Richard Siegel admitted that he gave interviews discussing Westgate Resorts business.  R.Siegel Transcr., Vol. I, at 144 [lines 2-17].  He did not recall asking David Siegel for permission, although he assumed he had spoken to David and that David knew and approved of the giving such interviews.  Id. at 144 [line 18] – 145 [line 6].  David tried to disclaim knowledge of this at the Evidentiary Hearing, but he had already admitted at his deposition that he knew about the interviews.

With regard to Richard Siegel's active involvement in other aspects of the Documentary, he admitted that (i) he made suggestions to the Production Entity about the filming of company activities (id. at 146 [lines 3-7]) and (ii) arranged with the Production Entity and scheduled shoots on company property (id. at 146 [lines 14-17]).

Richard Siegel said the Production Entity reached out to him directly for arranging shoots in Las Vegas because he was in charge of sales and marketing for that project.  Id. at 146 [lines

18-20].   Obviously the Production Entity was led to believe Richard had the authority to authorize filming.  They respected Richard's authority -- they did not come onto the property on the Las Vegas sales floor to start filming a sales session without talking to Richard first. R.Siegel Transcr., Vol. II, at 153 [lines 14] – 154 [line 15].  On other occasions, he gave them access to film (i) an old sales floor that had been closed (id. at 158 [lines 3-23]) and (ii) him eating dinner alone in the penthouse (id. at 158 [line 24 – 159 [lines 1-4]).

As to the Orlando properties, Richard Siegel also admitted that he gave the Production Entity permission to film him (a) in his Westgate Resorts office talking on the telephone (id. at 155 [lines 6-18]) and (b) at the call center leading a board meeting (id. at 156 [lines 7-13]). Richard went as far as to physically take the film crew through the call center to film him talking to employees along the way.  Id. at 156 [line 25] – 157 line 9].  Richard did not remember asking his father for permission to permit the aforementioned shoots in Las Vegas or Orlando.  Id. at 155 [lines 19-25], 156 [lines 14-17], 157 [lines 10-12].  The obvious inference is that Richard permitted the filmings because he had been given that authority.

But Richard Siegel claimed that he "most likely" would have asked his father David for permission because he would not allow the Production Entity to film anything throughout the company without David's permission.  Id. at 156 [lines 16-21].  This testimony is squarely contradicted by David, himself, who (as noted above) stated that Richard never asked for permission from him to do anything in any way.  D.Siegel Transcr. at 33 [lines 17-25] – 34 [lines 1-13].

Richard Siegel contradicts David's testimony as he claimed to specifically recall one instance in which he asked David for permission to let the Production Entity film – a shoot of him giving a talk to Westgate employees on the sales floor in Las Vegas – because it was

proprietary information.  David said yes.  R.Siegel Transcr., Vol. II, at 159 [line 5] – 160 [line 6].
(David contradicts this.)   Richard also recalled asking David for permission to do his first
interview.   Id. at 160 [line 18 – 161 [line 7].   (David contradicts this also.)   Richard later
reiterated that David only told him not to permit the Production Entity to film anything
proprietary.  Id. at 201 [lines 3-12].

Richard Siegel also testified about the signing of the Westgate Resorts Release.  [Defense
Exh. 25. 39a].  Prior to that time, Richard had already signed in respect of the Documentary (a) a
property release on behalf of "CFI/Westgate" [Defense Exh. 21, 36a] and (b) a location release
on behalf of "PH Westgate Towers" dated 4-28-11 [Defense Exh. 18, 37a].  Richard Siegel also
signed his own appearance release and an addendum thereto [Defense Exhs. 3-4, 35a and 38a].
As to those releases, Richard testified that: "They put them in front, I signed them."   Hearing
Transcr. at 143 [line 13] – 144 [line 7].   He never asked the impact or effect of signing the
documents.  Id. at 145 [lines 16-19].  Richard clearly had been given the authority to sign them –
why else would he do so?

Remarkably, Richard Siegel claimed that he did not recall having read his appearance
release before he signed it.  R.Siegel Transcr., Vol. II, at 171 [line 16] – 172 [line 25].  As to the
property release he signed on behalf of "CFI/Westgate" (Defense Exh. 21; 36a), Richard claimed
that he had no recollection of ever having seen it and because he did not remember signing it,
although it bore his signature, he had doubt as to whether he did, in fact, sign it.  Id. at 175 [line
12] – 176 [line 13].  As to the location release he signed on behalf of "PH Westgate Towers"
(Defense Exh. 18, 37a), Richard similarly denied ever having seen it.  Id. at 181 [lines 8-20].  He
eventually contradicted himself and admitted that he did sign both the property release and the

location release**, and said that he did not ask David for permission to do so**.  Id. at 199 [line 17] – 200 [line 10].

Richard Siegel then contradicted not only his father, but himself.   Richard reads documents before he signs them, but in the instance of the Westgate Resorts Release (Defense Exh. 25, 39a), he preposterously claims:

- **he did not read it before signing it** (Hearing Transcr. at 167 [lines 20-25], 168 [line 4] – 170 [line 3]; R.Siegel Transcr., Vol. II at 191 [lines 2-5, 19-21]);

- but nevertheless knew the Westgate Resorts Release did not have the words "Westgate Resorts" written in (Hearing Transcr. at 168 [lines 1-3]; R.Siegel Transcr., Vol. II at 188 [line17 – 189 [line11]).

He candidly admitted that **had he read the Westgate Resorts Release before signing it, he would have understood that it pertained to a company, not an individual**.  R.Siegel Transcr., Vol. II  at 193 [lines 14-18].  Of course, Richard Siegel wants it both ways -- simultaneously claiming he never read it and did not know it referenced "Company" numerous times, but knew that it was blank as to the name of the company.  He cannot have it both ways.

Richard also claimed that he was confused as to why Lauren Greenfield claimed she needed it.  R.Siegel Transcr., Vol. II at 197 [line 1] – 198 [lines 1-8].  Richard admitted that **despite having not read the Westgate Resorts Release and purportedly being confused as to why he needed to sign it, he signed it anyway**.  Id. at 198 [lines 9-16].  His testimony on these issues is preposterous.

**E.      Lauren Greenfield's Hearing Testimony and Deposition Testimony Establishes That She Acted Reasonably In Relying On The Statements of David And Richard Siegel As To Richard's Authority, Which Reliance Was Made All The More Reasonable Based On Richard's Authorization Of Filming And Signing Of Other Documents For Westgate Resorts**

Greenfield testified at the Evidentiary Hearing that David Siegel told her that Richard was part of the executive team, and "one of his top people."  Hearing Transcr. at 44 [lines 8-15].

She also gave deposition testimony which addressed Richard Siegel's real and apparent authority to act on behalf of Westgate Resorts in respect of the Documentary.  [Defense Exh. 74: "Greenfield Transcr."].  Greenfield testified that David Siegel asked her to work with Richard Siegel during the filming in Las Vegas.  Hearing Transcr. at 79 [lines 2-14]; Greenfield Transcr. at 17 [lines 6-8].  In particular, David said he wanted Richard to go with Greenfield to Las Vegas for a subsequent shoot, where Richard oversaw all of the filming out there.  Hearing Transcr. at 69 [line 7] – 70 [line 7]; Greenfield Transcr. at 22 [lines 19-23], 26 [lines 8-16].   That included more than 15 different scenes shot on more than six occasions, about which David was aware.  Greenfield Transcr. at 22 [line 24] – 23 [line 4], 26 [lines 14-16].  At the hearing, Greenfield listed several different Westgate Resorts locations where authorized filming occurred.  Hearing Transcr. at 39 [lines 8-15].

David was aware that filming of Westgate Resorts locations was happening because he would give general permission before Greenfield could travel to a particular location.  Hearing Transcr. at 41 [lines 3-16], 46 lines 23-25].  He knew about every trip.  Id. at 69 [lines 5-7]. Indeed, one of Richard's interviews was filmed at his office, which adjoins David's office.  Id. at 53 [lines 12-25].  There were approximately nine different filmings at Westgate Resorts.  Id. at 54 [line 22 – 55 line 2].  And David was present for some of them, and also arranged for some of the shootings at Westgate Resorts.  Id. at 61 [line 23] – 63 [line 16]. David even knew about the

direction of the film, because he talked about it with Greenfield before every trip.  Id. at 74 [lines 9-21].  David never gave Richard gave any restrictions in front of Lauren Greenfield about what she should or should not film.  Id. at 77 [lines 3-14].  Richard was given *carte blanche*.  "It was all "transparent."  Id. at 80 [lines 3-15].

Nor was there any reasonable doubt that David was being informed.  Employees were always present during shoots, and Richard would talk about his conversations with David.  Id. at 70 [lines 1-20].

Greenfield elaborated on Richard Siegel's role and authority over the course of the filming, which included (i) overseeing, supervising and authorizing all the filming at Westgate Resorts locations, (ii) asking senior managers and other Vice Presidents to cooperate, (iii) procuring requested releases for the Production Entity, (iv) suggesting what and who to film, (v) facilitating the assistance of Westgate Resorts employees and obtaining their personal releases, and (vi) signing previous releases.  Greenfield Transcr. at 36 [lines 2-10, 21-24]; Hearing Transcr. at 41 [lines 3-22], 42 [line 19] – 43 [line 11], 46 [line 23] – 47 [line 14].  Richard would give ideas, introduce the film crew, tell them that individual releases would be needed and even help procure missing ones after a shoot.  Hearing Transcr. at 55 [lines 3-16].  He was the primary contact for shooting at Westgate resorts locations, and advised the Production Entity of corporate happenings at Westgate Resorts.  Greenfield Transcr. at 36 [line 25] – 37 [line 5]; Hearing Transcr. at 39 [lines 16-20].

Nor was the procuring of employee and prospective customer releases a minor or inconspicuous undertaking.  About 220 such releases were obtained in total, and Richard oversaw most of them.  Hearing Transcr. at 61 [lines 18-21].

Greenfield recounted the substance of one event of filmed footage at Westgate Resorts, in which Richard Siegel (i) said that David Siegel thought the film would be good for sales, (ii) gave background and direction to both Greenfield and employees in respect of the shoot and what he wanted filmed and why, as well as mentioning releases.  Hearing Transcr. at 57 [lines 16-25], 59-60 [line 16].   The entire shoot was his idea.  Id. at 60 [line 17] – 61 [line 9]. Greenfield recounted how, on another shoot, Richard suggested and brought Greenfield in to film Westgate Resorts activities and locations that she never even knew about.  Id. at 67 [line 12] – 69 [line 1].  It was all Richard's doing, having been delegated to do so by David.

The previous releases Richard Siegel signed on behalf of Westgate Resorts were identified by Greenfield as (a) the property release on behalf of "CFI/Westgate" [Defense Exh. 21, 36a] (b) a location release on behalf of "PH Westgate Towers" dated 4-28-11 [Defense Exh. 18, 37a], and (c) a location release on the occasion of filming in Orlando [Defense Exh. 13].  Id. at 38 [line 12] – 39 [line 2].[5]  The Production Entity obtained these releases from Richard to cover the shooting of the physical locations, with no objection.  Hearing Transcr. at 54 [lines 1-21].

With respect to the meeting at which the Westgate Resorts Release was signed (in New York City), it was prompted by a confidential, executive level Westgate Resorts email that Richard had forwarded to Lauren.  Hearing Transcr. at 83 [lines 2-15], 85 [lines 5-25]. Greenfield testified that she wrote the words "Westgate Resorts" on to the document before Richard Siegel signed it. Greenfield Transcr. at 31 [lines 24] – 32 [line 6].  Greenfield testified that she asked Richard to sign it, not David, because Richard had overseen all of the Westgate Resort filming.  Id. at 24 [line 9] – 25 [line 1].  Given Richard's prior involvement in authorizing

---

[5]  In addition to all the releases Richard signed in a corporate capacity, he also signed his own personal appearance release at the first trip to Las Vegas.  Hearing Transcr. at 45 [line24 – 46 [line10]; Defense Exh. 3.

and supervising all the filming at Westgate Resorts, "it just made sense to give it to [Richard]." Id. at 28 [lines 15-20].  None of the other top executives at Westgate Resorts knew what they had filmed.  Id. at 45 [lines 14-21].  Moreover, Richard had previously signed location releases on behalf of Westgate Resorts.  Id. at 25 [lines 21-23].  When asked why Greenfield did not insert Richard Siegel's title, she said because she already knew he said he was a Vice President, which he stated in his own interview transcript.  Id. at 34 [lines 14-24].  As a Vice President and one of seven top executives, Greenfield assumed that Richard had the authority to sign for the company. Id. at 45 [line 22] – 46 [line 2].  He never stated that he -- the primary contact for filming -- did not have authority to sign the different documents on behalf of Westgate Resorts relating to the filming which had been put in front of him several times.  Id. at 33 [lines 6-15], 46 [lines 3-11].

Nor did Richard Siegel ever mention Westgate Marketing.  Hearing Transcr. at 39 [lines 21-25].  Indeed, Greenfield confirmed Richard's testimony that all the signs say "Westgate Resorts."  Hearing Transcr. at 40 lines 1-12].  They always referred to the company as Westgate Resorts, as well as on email and on all the signage.  Hearing Transcr. at 51 [line 23] – 52 [line 6].

## IV.    ARGUMENT

### RICHARD SIEGEL HAD BOTH REAL AND
### APPARENT AUTHORITY TO SIGN THE WESTGATE RESORTS RELEASE

It is well-settled that the authority of an agent to bind her principal may be real/actual or apparent.  Stiles v. Gordon Land Co., 44 So.2d 417, 412 (Fla. 1950).  Actual authority may include the implied authority to do those acts which are incidental to or usually accompany it. Board of Trustees of City of Delray Beach Police and Firefighters Ret. Sys. v. Citibgroup Global Mkts. Inc., 622 F.3d 1335, 1342-43 (11th Cir. 2010).  Such authority may be inferred from acts, conduct and circumstances.  Id. at 1343.

"By apparent authority is meant, such authority as the principal wrongfully permits the agent to assume or which the principal by his actions or words holds the agent out as possessing." Stiles v. Gordon Land Co., 44 So.2d at 412-13; see also, Bhadelia v. Marina Club of Tampa, 142 Fed. Appx. 399, 402 (11th Cir. 2005).  Where the principal allows or causes others to believe that an individual has authority to do the act at issue, apparent authority arises. Borg-Warner Leasing v. Doyle Elec. Co., 733 F.2d 833, 836 (11th Cir. 1984).  "Even if the principal is silent, apparent authority can arise when the principal by his or her actions creates a reasonable appearance of authority." Gilson v. TD Bank, 2011 WL 294447 *6 (S.D. Fla. 2011).  An agency may even be found though the principal and agent deny its existence. Bradley v. Waldrop, 611 So.2d 31, 33 (Fla. Dist. Ct. App. 1992).

Indeed, even where a principal is guilty of no affirmative wrongdoing, where the third party is equally without fault, "…the well known principle [is] that where one of two innocent parties must suffer a loss, that loss must be borne by the one whose acts enabled the loss to occur." Philips Petroleum Co. v. Royster, 256 So.2d 559, 561 (Fla. Dist. Ct. App. 1972).

The facts gleaned from deposition and hearing testimony demonstrate that both David and Richard Siegel made several affirmative, unequivocal representations, throughout filming and on camera, to the effect that Richard was, inter alia, Vice President of Westgate Resorts; Director of Sales; one of seven top executives wearing "a lot of hats"; "in charge of everything" in Las Vegas; with 14 departments reporting to him.  Thereafter, Westgate Resorts -- through David Siegel, its President and CEO -- did and said absolutely nothing to give the Production Entity any reason to believe that those statements were untrue.  But the contradictions between David and Richard Siegel confirm their attempt to lie their way out of the Westgate Resorts Release.

Whose testimony to believe (whether David or Richard) as to how Richard became involved in the Documentary and with what authority matters not. The credible testimony establishes that David Siegel knowingly permitted Richard Siegel to assume responsibility and authority to oversee, supervise and authorize all filming on company property and of company activities. There is no credible dispute in the testimony that David was aware that Richard was acting in this capacity in respect of the Documentary, and that the Production Entity was acting accordingly. David either proposed or acquiesced in Richard's assumption of authority, but either way he voiced no objection to it whatsoever. David was silent.

The facts also show that because of (x) the earlier representations made of Richard's authority in respect of Westgate Resorts, (y) Richard's assumption of the chief role in overseeing, supervising and authorizing all Documentary filming of Westgate Resort activities, and (z) David's consent to Richard's authority in respect of the Documentary, the Production Entity reasonably looked to Richard to sign releases purportedly in favor of the Production Entity on behalf of "CFI/Westgate", "PH Westgate Towers" and, ultimately, Westgate Resorts. At no time did Richard state to the Production Entity that he had no authority to sign such documents. He signed them unhesitatingly. And David allowed it to occur – he knew of and consented to Richard's supervision and authority as to all company matters related to the Documentary. Even if David's contradictory denials of any real knowledge as to what was being filmed could be credited (they should not), all he had to do was ask. He could have put a stop to Richard's exercise of real and apparent authority at any time. He failed or chose not to do so.

The Production Entity acted reasonably at all times under the circumstances presented. Neither David nor Richard gave it any reason to question Richard's stated and demonstrated authority. In these circumstances, where the Production Entity is an innocent party faced with a

loss (i.e., the unenforceability of the Westgate Resorts Release), that loss must be borne by the one whose acts enabled the loss to occur, namely Westgate Resorts (through David Siegel). Richard Siegel's authority to bind Westgate Resorts under the Westgate Resorts Release -- whether real or apparent -- is legally binding.

WHEREFORE, Defendants respectfully request that this Court grant their motion to stay the action pending arbitration due to the enforceability of the arbitration provision contained within the Westgate Resorts Release executed by Richard Siegel.

Respectfully submitted this 15th day of December, 2012.

/s/ Martin Garbus
Martin Garbus
MARTIN GARBUS, ESQ.
NY Bar No.: 1499987
mgarbus@evw.com
JOSEPH JOHNSON, ESQ.
NY Bar No: 2653210
jjohnson@evw.com
EATON & VAN WINKLE LLP
3 Park Ave., New York, NY 10016
P: 212.779-9910
F: 212.779-9928
(admitted pro hac vice)
Attorneys for Defendants

/s/ Richard C. Wolfe___
Richard C. Wolfe
Florida Bar No. 355607
WOLFE LAW MIAMI, P.A.
RICHARD C. WOLFE, ESQ.
175 Southwest 7 Street, Suite 2410
Miami, Florida 33130
rwolfe@wolfelawmiami.com
P: 305.384.7370
F: 305.384.7371
Attorneys for Defendants