IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:12-cv-35-ORL-18-GJK

WESTGATE RESORTS, LTD.,
a Florida limited partnership,

      Plaintiff,

v.

LAUREN GREENFIELD, an individual,
FRANK EVERS, an individual, and
GREENFIELD/EVERS LLC dba Evergreen Pictures,

      Defendants.

_____/

## WESTGATE'S POST-HEARING MEMORANDUM OF LAW IN CONNECTION WITH FEDERAL ARBITRATION ACT § 4 EVIDENTIARY HEARING

Per this Court's direction at the evidentiary hearing on December 3, 2012 (the "Hearing") to determine whether Plaintiff Westgate Resorts, Ltd. ("Westgate" or "Plaintiff") made an agreement with Defendants to submit this dispute to binding arbitration, Westgate files this Post-Hearing Memorandum of Law regarding the issue of Richard Siegel's apparent authority to bind Westgate.

## PROCEDURAL BACKGROUND[1]

This case arises out of the disparaging depiction of Westgate in a documentary film titled "Queen of Versailles" (the "Film") directed by Defendant Lauren Greenfield ("Greenfield") and produced by Greenfield's production company, Greenfield/Evers, LLC ("G/E").  Plaintiff filed its Amended Complaint on May 11, 2012 asserting seeking claims for defamation, false light

_____

[1].   A more detailed factual and procedural background to this case appears in Plaintiff's Response to Defendants' Motion to Stay the Action Pending Arbitration [DE 43] which is incorporated as though fully set forth herein.

1

defamation and declaratory relief.  Instead of addressing the merits of Westgate's claims in a responsive pleading to the Amended Complaint, Defendants filed a Motion to Stay the Action Pending Arbitration (the "Motion to Stay")[2] contending that a document Richard Siegel – who is not a party to this case - signed on November 26, 2011 (the "Release") required Westgate's claims be submitted to binding arbitration.  This Court denied the Motion to Stay, concluding:

> the issue of whether Richard Siegel, the signatory on the release, had the authority to bind Plaintiff under the release goes to the existence of the agreement rather than to its validity; thus, requiring this Court, rather than arbitrator, to determine whether an agreement exists between the parties.[3]

Having thus defined the question to be answered, the Court set an evidentiary hearing limited to this narrow issue which was held on December 3, 2012.  *Id.*  In advance of the hearing, the parties engaged in limited discovery.  The discovery and the testimony at the hearing revealed that, in fact, no agreement to which Westgate is a party exists because: (i) Richard Siegel – the only signatory to the Release - did not have actual authority to sign the Release on behalf of Westgate; and (ii) Richard Siegel did not have apparent authority to sign the Release on behalf of Westgate.

## FACTUAL SUMMARY

### A.  Corporate Structure of the business organization known as "Westgate Resorts"

Westgate Resorts, Ltd., the only plaintiff in this case, is one of many distinct legal entities comprising the business organization known as "Westgate Resorts" that owns, operates, manages, markets and sells timeshare interests at various resorts throughout the country. Westgate Resorts, Ltd., the plaintiff in this case, is one of several companies that develops,

---

2.      [DE 30].
3.      *See* Order [DE 48].

2

manages and sells inventory at timeshare resorts.[4]  Another company, Westgate Marketing, LLC, conducts sales and marketing services for the resorts.[5]  Richard Siegel is employed by Westgate Marketing, LLC, which acts as the broker for Westgate Resorts, Ltd. (and other of the timeshare developer entities) to market and sell timeshare inventory at the individual timeshare resorts.[6]  Westgate Marketing, LLC does not own any property, let alone any of the physical locations at which Richard Siegel accompanied Greenfield in shooting the Film.[7]

Although Richard Siegel's employment documents and business cards contain the logos of Central Florida Investments and Westgate Resorts – the badges of the Westgate Resorts brand - his employer is Westgate Marketing, LLC.[8]  These standardized documents and generic business cards were printed many years prior to 2011--when the Release was signed—and even prior to when Westgate Marketing, LLC was formed as an entity.[9]  More importantly, Greenfield never saw a single one of these documents prior to November 26, 2011 when the Release was signed, and obviously could never have relied upon whatever such documents might say about Richard Siegel's stature within the organization generally or his position, if any, with Westgate Resorts, LTD. in particular.[10]

---

4.      Transcript of Evidentiary Hearing [DE 75].  For the convenience of this Court the cited transcript pages are attached hereto as Exhibit "A", p. 212.

5.      Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 132.

6.      Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 133.

7.      Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 148.

8.      Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 132

9.      Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 173-78.

10.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 216; Deposition of Lauren Greenfield, pp. 35-36. For the convenience of the Court the cited pages from Greenfield's deposition are attached hereto as Exhibit "B".  Fed. R. Civ. P. 32(a)(3) authorizes the use of Greenfield's deposition, as she is a party:  "[a]n adverse party may use *for any purpose* the deposition of a party…".  In addition, the Court received the transcript and

### B.  Richard Siegel's Position within the "Westgate Resorts" Organization

Richard Siegel's job title with Westgate Marketing, LLC is "vice president".[11]  However, the designation of "vice president" is strictly honorary, unaccompanied by any of the traditional corporate authority such a position might otherwise garner its occupant.  Indeed, that title – as with Richard Siegel, devoid of any presumptive actual corporate authority - has been bestowed upon approximately a dozen other individuals working for one of the distinct companies within the Westgate Resorts organization.[12]  In fact, there are only two actual corporate officers in the organization—David Siegel who is president and secretary and Tom Dugan who is the treasurer.[13]  And Greenfield generally knew this.  Greenfield testified, claiming that in her interview with Richard Siegel, he represented that "he was one of seven top executives"; in truth, Richard Siegel told Greenfield: "I'm not - - I'm – still I'm definitely not his right-hand man.  He has about seven executives. I'm just one of them, but I do a lot of work."[14]  Importantly, since only David Siegel, indisputably the "principal" in the agency construct, could endow Richard Siegel with the authority to sign the Release, Greenfield confirmed that David Siegel never told her that Richard Siegel was a vice president.[15]

David Siegel also explained in an interview to Greenfield that Richard Siegel's role within the Westgate Resorts organization is strictly limited to sales functions. Greenfield agreed that she understood this to be the case:

---

accepted this intended use of the deposition testimony. *See* Transcript of Evidentiary Hearing [DE 75], pp.130-31.
11.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 134.
12.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 134.
13.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A",  p. 215-16
14.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 44-45; Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 44-45.
15.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 44.

Q. So again, the primary definition [of Richard Siegel's role] by David Siegel is in terms of sales, right? That's how you would take his words in this interview?

Greenfield: Okay. Uh-huh.[16]

## C. The Release

The Release bears Richard Siegel's signature; but nowhere does this document identify his title or position with any organization (much less the one whose name Greenfield, not Richard Siegel, wrote in) nor does it designate the entity for which Richard Siegel was supposedly signing this document. So on the face of the document – with the critical elements of a corporate obligation completely missing (*i.e.* name of the organization, name of the signatory and position occupied by the signatory) - before Greenfield later hand wrote the phrase "Westgate Resorts" in a blank line, it was signed, by Richard Siegel, for himself and for no-one else.[17]  Interestingly, Greenfield had her lawyer prepare this document especially to present to Richard Siegel[18]. Had Greenfield truly been, as she now testifies with such conviction, certain of Richard Siegel's stature with a company which had never before signed or even been presented with any document during the filming process, why, one must wonder, was the document still blank; would it not have been trivial for Greenfield's lawyer to "fill in the blanks" and remove all doubt as to who the document was for and what its purpose will be?

Consistent with the inescapable conclusion that a "blank" document can bind no-one other than its actual signatory, Richard Siegel testified that at the time he signed the Release, the space where, ostensibly, the name of an organization could be stated, was left blank.[19]  Lauren

---

16.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p.102
17.    *See* Release, attached hereto as Exhibit "C", Defendants' Exhibit 25 [DE 73].
18.    Transcript of Evidentiary Hearing [DE 75], pp. 32-33.
19.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 140.

Greenfield agreed that she – not Richard Siegel, the signatory - handwrote the name "Westgate Resorts" at the top of the Release but never clarified who or what precisely this descriptor was meant to identify, given that she well knew that "Westgate Resorts" was, in the main, a brand[20], a descriptor referring to the entire organization comprised of numerous discrete, distinct, legal entities., was commonly referred to.[21]

As one would expect for a document to be signed as an individual (and in stark contrast to a document prepared by a lawyer and supposedly specifically intended to be executed in behalf of a corporate entity), nothing appeared under Richard Siegel's signature to designate his title, position or connection to "Westgate Resorts".[22]  Greenfield testified that she "never thought of asking him to write his title [on the Release]. . . [and] never asked him if he was authorized to authorize the filming."[23]  Richard Siegel testified that Greenfield did not provide any explanation why, beyond "I need you to sign this for the footage we shot in Las Vegas".[24] Richard Siegel did not make any inquiry, investigation or analysis prior to signing the Release or any other release in connection with the Film as to the effect or scope of such documents.[25]

**D. Contrary to her testimony, Greenfield's actions reveal that she knew the distinction between the Westgate Resorts Entities and that the Release was an important document**

---

20.    Like, for instance, Marriott; Transcript of Evidentiary Hearing [DE 75] pp. 199.

21.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 29; Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 127.

22.    *See* Release, attached hereto as Exhibit "C", Defendants' Exhibit 25 [DE 73].

23.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 35.

24.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 142.

25.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 141-45 ("They're always blank when they put them in front of me. I just signed them").

Greenfield admitted that she never knew or asked what type of legal entity "Westgate Resorts" was in order to insure that the correct organization was identified in the Release.[26] Perhaps not surprisingly, given that the document was first presented to Richard Siegel more than two (2) years after this documentary project began, and only when the film was virtually completed, Greenfield acknowledged that the Release, the only document that Defendants contend obligates Westgate Resorts, Ltd. to arbitration, was not that important to her because "[i]t wasn't something that I thought we necessarily needed."[27] She testified that "it wasn't like the whole movie had hinged on it."[28] Tellingly, it was almost certainly the last document signed in connection with the film several years after the filming began.[29] Despite the many opportunities Greenfield had to present this particular document to David Siegel for his signature, having spent hundreds of hours with him, she never did.[30]

And although Greenfield testified that she had no idea of any separate entities within the Westgate organization, her actions reveal the opposite.[31] In fact, had she truly believed that Westgate Resorts was all one entity, then there was absolutely no reason for her to ask Richard to sign the Release. She already had several other releases signed by Richard Siegel for "PH

---

26. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 29 ("I didn't even know there were different pieces of the company. We just called it Westgate Resorts").

27. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 47-48; Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 72 ("The Westgate Resorts release was something that after my lawyer had looked at all of our releases, he said I didn't need anything else").

28. Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 72.

29. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp.12-13.

30. Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 117.

31. *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp.40, 43.

Towers" and "CFI/Westgate".[32]   When asked if she believed that these other releases, Exhibits

No. 18, and Exhibit No. 25 in particular, as being pertinent to Westgate Resorts, Ltd. she

answered "yes". [33] If that was truly the case, then there was clearly no reason for Greenfield to

ask Richard Siegel to sign the Release.   Nonetheless the Release is the only document that

Defendants rely upon and contend obligates the Plaintiff to arbitrate, even though, for instance,

Defendants' Exhibit 21, a "CFI/Westgate" release, also contains a binding arbitration clause.[34]

### E. The Authority of Richard Siegel to sign the Release on behalf of Westgate Resorts, Ltd.

David Siegel, the president of the Westgate Resorts organization, and its sole owner,

testified that none of those denominated as "vice presidents" within the Westgate Resorts

organization has the authority to sign any material contract or otherwise obligate the company

without David Siegel's prior express authorization.[35]   David Siegel is the only person who is

authorized to act on behalf of the entire Westgate Resorts business organization.[36]   Richard

Siegel confirmed this with his testimony at the Hearing:   "He has 100-percent say-so and

authority and he doesn't give it to anyone else".[37]

---

32.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p.145; *see also* Defendants' Exhibits 18 and 21 [DE 73], attached hereto as composite Exhibit "D." While these releases are titled "location release" and "property release" respectively, there are no addresses or other location information contained anywhere on the documents and tellingly, there is no particular location known as CFI/Westgate.  Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 145-46.

33.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 120-21.

34.     *See* Composite Exhibit "D".

35.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 156 ("No one has authority other than David Siegel").

36.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p.209.

37.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 155.

Richard Siegel manages some of the organization's sales and marketing functions.  In that limited role, he has signed various contracts to buy attraction and show tickets and hire brokers to produce sales prospects, a far cry from releasing legal claims for untold financial damages and waiving the entire organization's right to file a lawsuit in court ***completely unrelated to any of the organization's sales or marketing operations***.  Moreover, notwithstanding Defendants' attempts at misdirection at the hearing, these agreements are signed on behalf of Westgate Marketing, LLC.  At the Hearing, Defendants pointed to a few documents where the words: "Westgate Resorts" were handwritten into these ticketing agreements. Richard Siegel testified that this was written in after he signed the agreements and that he was signing such agreements on behalf of Westgate Marketing, LLC.[38]  But when one looks a few lines down the page, one sees that Westgate Marketing, LLC is identified as the contracting party".[39] Indeed, Westgate Marketing, LLC or its predecessor, CFI Sales & Marketing, LLC were specifically identified as the contracting parties in most of these agreements.[40]  More importantly, Greenfield never had these agreements and testified that she never relied upon them to glean Richard Siegel's authority to bind Westgate.[41]

And, Richard Siegel signed these agreements (many after the date he signed the Release) because all of them were intrinsic to the sales and marketing activities in which he was then

---

38.    *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 163-64.

39.    *See* Defendants' Exhibits 25a, 26a, 30a, 31a, attached hereto as Composite Exhibit "E".

40.    *See, e.g.* Defendant's Exhibits 25a, 26a, 30a, 31a, 32a, 33a attached hereto as Composite Exhibit "E"; *see* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 201-203. Defendants' counsel, either oblivious to or desperately ignoring the evidence, unjustly castigated Westgate Resorts, Ltd. by wrongly portraying Richard Siegel's well documented employment by Westgate Marketing, LLC as a "sham".

41.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 35-36.

engaged and all were signed only after David Siegel's prior express permission and authorization:[42]   Contrast the very limited obligation and commitment Westgate Marketing LLC assumed under each of these contracts with the draconian terms of the Release, especially in light of the breadth and scope of interpretation Defendants posit it is due. This is why David Siegel's testimony that he told Greenfield he was the only person authorized to make any decisions, transact any business or sign any contracts on behalf of the company rings so true.[43]   David Siegel and Richard Siegel both testified that Richard never asked him for permission to sign a document like this Release, a document well outside the boundaries of the sales and marketing arena in which Richard Siegel has always operated.[44]

Richard himself testified that he does not and did not ever have the authority to sign any document that would have released claims on behalf of Westgate Resorts, Ltd. or that would have required Westgate Resorts, Ltd. to submit to binding arbitration.[45]   Specifically, Richard Siegel testified that he was not authorized to sign the Release on behalf of Westgate Resorts, Ltd. and was not acting as an agent for Westgate Resorts, Ltd. at the time the Release was signed.[46]

---

[42].     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp.149-50.

[43].     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp.209, 215-16 ("I told her that I run it like a dictator, that I make all the decisions, I sign all the checks in the company, I'm the only officer, other than my CFO, who is a –happens to be a treasurer of the company only for the purpose of—of dealing with banks, that no one has any authority in the company other than myself to make any—any transact—sign any papers, make any transactions, agree to any contracts or other dealings like that.") .

[44].     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 210.

[45].     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 148-49.

[46].     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 156.

And, most importantly, David Siegel, the only person capable of speaking for the "principal",

entirely agreed.[47]

### F.  Richard Siegel's Apparent Authority to Sign the Release

Greenfield did not ask David Siegel nor did she perform any due diligence, investigation

or research prior to November 26, 2011 to determine whether Richard Siegel had authority to

execute Westgate Resorts, Ltd. corporate documents, including the Release.[48]  Furthermore, she

testified that neither Richard Siegel nor David Siegel ever told her that Richard Siegel had the

authority to sign corporate documents, such as the Release, on behalf of Westgate Resorts, Ltd.:

> Q.    Did Richard Siegel ever tell you that he had the
> authority to sign corporate documents including releases on behalf
> of Westgate Resorts, Limited?
>
> A.    He never said he had the authority.[49]

Other than conversations between Greenfield and David Siegel concerning the roles of

his sons, Steven and Richard, in the company, Greenfield never spoke with David Siegel or

anyone else that related to the roles of Richard Siegel in the company Westgate Resorts.[50]

---

47.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 210, 213-14

48.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 35-36.  To the extent that Defendants rely upon internet articles identifying Richard Siegel as a "vice president" of "Westgate Resorts", Plaintiff moves to strike the introduction of this evidence as hearsay and because Greenfield testified that she never did any due diligence to determine that Richard Siegel had the authority to execute the Release.  *See* Defendants' Exhibits 19a-24a; *see also Dollar v. State,* 685 So.2d 901, 903 (Fla. 5th DCA 1996) ("A newspaper article, introduced to prove the truth of out of court statements contained therein, constitutes inadmissible hearsay.").  In fact, one of the articles is dated October 16, 2012, which is after the Release was signed, conclusively proving that Greenfield did not and could not have relied upon it prior to the execution of the Release.   In addition, the Court sustained an object at the hearing as to these articles generally.  *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p.185-86.

49.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 33.

50     Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 20.

Q.     Now just so I am clear, you don't - - you don't have any recollection of a conversation with David regarding the authority of Richard to execute contracts on behalf of Westgate Resorts?

A.     That's not something that we ever discussed, so it's not that I don't have a recollection, but we never discussed that. But we did - - David did say that he wanted Richard to go with me to Vegas, and Richard oversaw all of the filming that we did at Westgate Resorts, which began in January, 2010.[51]

…

Q.     Well, what did [David Siegel] tell you about – other than telling you that you could film Richard and you could go to Las Vegas and interview Richard and meet with Richard, is it fair to say that you never had a discussion with David about Richard's authority to execute documents on behalf of Westgate?

**A.     I never had a discussion with David about anybody's authority to – to write the documents that they were – that they were signing.[52]**

David Siegel's own testimony corroborates this. David Siegel informed Greenfield that he makes all the decisions, signs all the checks in the company, that no one has any authority in the company to sign any papers, make any transaction or agree to any contracts.[53]   He certainly never told Greenfield that anyone other than himself was authorized to sign a release in connection with the Film:[54]

Q. Did Ms. Greenfield or anyone in her behalf ever ask for any evidence of Richard Siegel's authority or any indication of his authority to sign any documents?

A. No.

---

51     Deposition of Lauren Greenfield, attached hereto as Exhibit "B", p. 22.
52     Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp. 26-27 (emphasis supplied).
53.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 215-16.
54.     Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 215.

> Q. And have you ever given – have you ever indicated to – let's not use the word – have you ever told Ms. Greenfield that Richard Siegel was authorized to sign any paper in behalf of Westgate Resorts?
>
> A. No, never.
>
> Q. And, again, she never asked you?
>
> A. Never asked. And I never told her.[55]

Finally, Greenfield visited David Siegel for a few days immediately after the Release was signed by Richard Siegel but curiously never mentioned anything to David Siegel about the Release.[56] She never even told David Siegel that she had seen Richard the day before.[57] In fact, David Siegel did not learn about the Release or any of the location/property releases signed in connection with the film until this litigation arose—and certainly never authorized them.[58]

Defendants will argue that Greenfield reasonably relied upon Richard Siegel's apparent authority to bind the company because of the things that Richard Siegel said and did. But Greenfield's own words undercut this assertion. Greenfield testified while Richard Siegel may have been her tour guide, those tours were first authorized by David Siegel with whom she arranged everything and who knew about every single trip.[59] Before every trip made in

---

55. Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 216-17.
56. Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp.27-28.
57. Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 214-15.
58. Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 228 (David Siegel: "I never saw [the Release] until this Court case"); Transcript of Evidentiary Hearing [DE 75], attached hereto as Exhibit "A", p.192 (Richard Siegel testified that he never discussed the Release with his father until after the litigation had begun); p. 201.
59. Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 69 (Greenfield: "David knew about every single trip."; p. 61 "David Siegel had arranged for some of the shooting at Westgate directly.").

connection with the film "[e]ither myself of my producer would get permission from David to come."[60]   Acknowledging that Richard Siegel accompanied her at David Siegel's direction, and belying any justifiable reliance on Richard Siegel's authority to do anything other than escort her to a couple of the Westgate Resorts properties:

> Q. And so – and many of those instances in which Richard Siegel guided you through the company were at the direction of David Siegel after you had first spoken to David and he directed you to Richard, isn't that right?
>
> A. Well, **my understanding is that David sanctioned the film in general.**   I have no idea whether Richard spoke to David specifically about every situation that we filmed
> . . .
> Before a shoot, myself – before a trip, myself or Rebecca would call David.  Usually Rebecca. Or call Maria, David's assistant and say "We want to come film, you know, does that work? Can we get the accommodation?"[61]

And even despite the fact that Richard may have arranged for Lauren Greenfield to videotape a meeting or a sales floor presentation, these actions simply are not comparable to a situation where Richard Siegel signing away important legal rights that the company has to bring a lawsuit for financial inquiry.[62]   Certainly, Richard Siegel signing a property or location release preceding a filming already authorized by David Siegel which did little more than protect Greenfield should, for instance, one of her cameras break a window can hardly be compared to or a ratification of a release signed after the filming was already done by a company unconnected to a filming location and broadly exculpating Greenfield and her company for literally every wrong she could ever commit.  Greenfield explained the dichotomy of Westgate in an excellent way:

---

60.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 74.

61.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp.108-09. (emphasis supplied).

62.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 251.

> David certainly is – the whole reason that we were filming at
> Westgate was because of David's company.   David was the
> principal, and the company, he created it. . . I don't' know exactly
> how it's structured but I think that both David is involved in
> everything at the company which is why I think he knew about all
> of the things that we were filming. . . [63]

Given this understanding of David's role within the company and given the multiple

opportunities Greenfield had to present the Release to David Siegel for his signature, there are

simply no grounds for Greenfield to allege that the Release – signed solely by Richard -- is

binding upon Westgate.

## **BURDEN OF PROOF UNDER § 4 OF THE FEDERAL ARBITRATION ACT**

Under Section 4 of the FAA, a party may seek an order compelling arbitration "under a

written agreement for arbitration," and a court may make an order directing the parties to

proceed to arbitration only upon "being satisfied that the making of the agreement for arbitration

. . . *is not in issue.*"[64]   The party seeking to compel arbitration "bears the burden to prove the

existence of the agreement."[65]   When determining whether a valid arbitration agreement exists,

courts apply the contract law of the particular state that governs the formation of contracts.[66]

Thus, under Florida law the party seeking to compel arbitration bears the burden of establishing

the existence of an agreement to arbitrate by a preponderance of the evidence, just as the party

---

63.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 114.
64.    9 U.S.C. § 4 (emphasis supplied).
65.    *Schoendorf v. Toyota of Orlando,* No. 6:08–cv–767–Orl–19DAB, 2009 WL
1075991, at *7 (M.D. Fla. 2009).
66.    *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) (explaining
that courts generally apply ordinary state-law contract principles in deciding whether the parties
have agreed to arbitration); *see also Granite Rock Co. v. Int'l Bhd of Teamsters*, 130 S. Ct. 2847,
2856 (2010) ("a court may order arbitration of a particular dispute only where the court is
satisfied that the parties agreed to arbitrate that dispute" and to "satisfy itself that such agreement
exists, the court must resolve any issue that calls into question the formation or applicability of
the specific arbitration clause that a party seeks to have the court enforce").

seeking relief under any other alleged contract has the burden of proving that contract's existence.[67]  As a sister court held in *Schoendorf v. Toyota of Orlando,* No. 6:08–cv–767–Orl–19DAB, 2009 WL 1075991, at * 6 (M.D. Fla. 2009):

> To prove the existence of a contract [compelling arbitration] under Florida law, the party seeking to enforce the contract must prove "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver,* 875 So. 2d 375, 381 (Fla. 2004) (describing the "basic requirements of contract law"). The proponent of the contract must prove these elements by a ***preponderance of the evidence***. *Id.* (oral contract); *see also Robbie v. City of Miami, Fla.,* 469 So. 2d 1384, 1385 (Fla. 1985) (written contract). When one party is seeking to enforce a challenged agreement to arbitrate, "the [party] who should lose on the issue of an agreement to arbitrate is the one who failed to carry its burden of proving an acceptance of arbitration as a contractual remedy." *Steve Owren, Inc. v. Connolly,* 877 So. 2d 918, 920 (Fla. 4th DCA 2004) (citing *Shearson, Lehman, Hutton, Inc. v. Lifshutz,* 595 So. 2d 996, 997 (Fla. 4th DCA 1992)).[68]

As a document − in the construct above, the offer − undoubtedly exists, the central contract formation issue is really the acceptance: did Richard Siegel have the authority to "accept" the offer − sign the Release − in behalf of Westgate Resorts, Ltd.?  Westgate's discussion of relevant agency principles follows. But a third contract formation element: consideration, cannot be overlooked here. This agreement to arbitrate must, at least at this point, stand apart for the contract (here, the Release) as a whole.  And the agreement to arbitrate, to exist, must satisfy each contract formation elements. While Defendants, who must prove the existence of the agreement to arbitrate, have focused on Richard Siegel's supposed authority, they have failed entirely to show that the agreement to arbitrate (separate from the Release itself) was supported by any consideration whatsoever.  Indeed the cumulative testimony on this critical

---

67.     *Schoendorf v. Toyota of Orlando,* No. 6:08–cv–767–Orl–19DAB, 2009 WL 1075991, at * 6 (M.D. Fla. 2009).

68.     *Id.* at *6 (emphasis supplied).

elemental issue is indisputably to the contrary, proving the negative:  Westgate Resorts, Ltd. got

nothing of value from Defendants to agree to arbitrate and Greenfield never gave any reason why

Westgate Resorts, Ltd. would forsake its right to sue in court or that she, or any of the other

Defendants, gave Westgate Resorts, Ltd. anything of value to induce them to do so.  So beyond

the absence of authority of the signatory of the Release we demonstrate next, the formation of an

agreement to arbitrate also fails for lack of consideration.

So, here, Defendants have the burden to prove that they made a contract with Westgate

Resorts, Ltd. which requires that these disputes be arbitrated.  Defendants must proceed first and

prove a *prima facie* case, by a preponderance of the evidence, that an agreement to arbitrate

between Westgate Resorts, Ltd. and Defendants exists.  Failing that, Westgate Resorts, Ltd. has

no obligation to rebut facially insufficient evidence of the making of an arbitration agreement.

## **ARGUMENT**

### I.    **RICHARD SIEGEL DID NOT HAVE ACTUAL AUTHORITY TO BIND WESTGATE**

While a signed arbitration agreement ordinarily leaves a court little but to compel

arbitration, ***this proposition applies only if the individuals who signed the agreement are***

***legally authorized to bind the respective parties***."[69]  Here, it is evident that Richard Siegel, who

can be, at most, only an agent of his employer (now, Westgate Marketing, LLC), was not the

agent of Westgate Resorts, Ltd, either express or implied, and was without the authority to bind

Westgate.

For actual authority to exist such that the principal is bound, there must be an agency

relationship, which requires: (1) the principal to acknowledge that the agent will act for it; (2) the

---

69.    *Smith Wilson Co. v. Trading and Development Establishment*, 744 F.Supp. 14, 16
(D.D.C. 1990).

agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent.[70]  Richard Siegel did not have express authority to sign the Release because, as both Richard Siegel and David Siegel testified, Richard Siegel did not have any authority to bind Westgate Resorts, Ltd. at any point in time, and neither ever told Greenfield otherwise.[71]

Moreover, while the Release is signed by "Richard Siegel"; no title is indicated, nor is there any indication that Richard Siegel is signing in any representative capacity.[72]  A contract which on its face appears to be that of a corporation, but signed only with the name of an individual is not binding on the corporation in the absence of evidence to the contrary.[73] Greenfield's lawyer who prepared the Release would presumably have known this and would have, had the intent of the Release been as Greenfield contends, created the Release with "Westgate Resorts" and Richard Siegel's name and corporate position already typed in.  That the Release was entirely blank in each of these critical aspects speaks loudly. And, even if the Release had actually stated "Westgate Resorts" at top prior to Richard Siegel's signature like Greenfield claims, that is still insufficient: there was no title or other statement of authority next

---

70.    *See Whetstone Candy Co., Inc. v. Kraft Foods, Inc.,* 351 F.3d 1067, 1077 (11th Cir. 2003).

71.    *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 148-49, 216-17.

72.    *See* Release, attached hereto as Exhibit "C", Defendants' Exhibit 25 [DE 73]; *see also* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp.139-40

73.    *Bellaire Sec. Corp. v. Brown,* 168 So. 625, 636 (Fla. 1936) ("According to the strict common-law rule, in order to bind a principal by a contract under seal, as this one was, the instrument must profess to bind the principal, and it must be executed in his name and as his deed or contract. If it purports to be executed as the instrument of the agent and under his individual signature and seal, it is not binding on the undisclosed principal, even though the other party to the instrument actually knows the principal and that the agent is contracting for him. And the rule is a familiar one that the authority of an agent cannot be established merely by proof of his own declarations made to a third party, in the absence of the principal."); *see also Coyle v. Smith*, 300 So. 2d 738, 739 (Fla. 4th DCA 1974) (there were jury issues as to the existence of an agency relationship between the parents and their son, and if the relationship existed, whether the son was acting within the scope of his real or apparent authority).

to Richard Siegel's name. Certainly, Greenfield has never suggested that Richard Siegel occupied any office other than "vice president". But "president" is the presumptive highest corporate office, the office Greenfield certainly knew was occupied – and had always been occupied – by David Siegel. Defendants never explain why no attempt was ever made to get a critical document like the Release signed by the one corporate representative whose authority was unchallenged: the President of Westgate Resorts, Ltd, David Siegel.[74]

In sum, it is clear that Richard Siegel did not have actual authority to bind Westgate Resorts, Ltd.  Besides the testimony from both Richard Siegel and David Siegel that Richard Siegel has never had the authority to bind Westgate Resorts, Ltd. and that neither of them ever said otherwise to Greenfield, Richard Siegel's own actions support this.  Richard Siegel never signed any documents binding Westgate Resorts, Ltd., and in the ordinary course of his employment with Westgate Marketing, LLC he only signed marketing, ticketing and broker agreements on behalf of his actual employer with David Siegel's prior express authority and consent.[75] Finally, the fact that Richard Siegel was one of at least a dozen "vice presidents" does not impute corporate authority.[76]  For these reasons, Richard Siegel did not have actual authority to sign the Release on behalf of Westgate.

---

74.    Westgate's testimony been consistent in identifying the "officers" of Westgate Resorts, Ltd: David Siegel is and Richard Siegel is not. *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 137, 211.

75.    *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p.150 ("A. I don't sign anything without asking him first. Q. Okay. And be fair to say that in the two examples you gave, those were contracts you signed after discussion with David Siegel?  A. Yes.").

76.    *See Pensacola Firefighters' Relief and Pension Fund Bd. of Directors v. Merrill, Lynch, Pierce, Fenner & Smith*, 2010 WL 4683935, at *5 (N.D. Fla. 2010) (finding that the mere job title of Senior Vice-President "in a large company d[oes] not demonstrate that [the individual] was a corporate privilege holder with access to the privileged information Plaintiff seeks or had the authority to disclose such privileged information .").

## II.   RICHARD SIEGEL DID NOT HAVE APPARENT AUTHORITY TO BIND WESTGATE[77]

In addition to not having the actual authority to bind Westgate, Richard Siegel similarly did not have the apparent authority to bind Westgate.  Apparent agency exists only if all three of the following elements are present: (1) a representation by the ***purported principal*** that the agent is authorized to act on behalf of the principal; (2) a good-faith reliance on that representation by a third party; and (3) a change in position by the third party who suffers a detriment in reliance on the representation.[78] The critical issue in the analysis is not the subjective belief by the third party that the agent had the authority to act on the principal's behalf, but rather an objective manifestation by the ***principal*** to the third party that the agent has authority to act on his behalf.[79] Thus, the principal must take some affirmative act to imply to the third-party the agent has authority, or the principal must later ratify an act performed by the agent.[80]  Importantly, it is not what the agent says or does that can create the apparent authority, it is what the principal says or

---

77.    Florida law equates apparent authority with the doctrine of agency by estoppel. *See State, Dept. of Transp. v. Heckman*, 644 So. 2d 527, 529 (Fla. 4th DCA 1994) ("The doctrine of agency by estoppel is similar to the doctrine of apparent authority such that there is no significant difference between them. In order to hold the principal liable it must be established (1) that the principal manifested a representation of the agent's authority or knowingly allowed the agent to assume such authority; (2) that the third person in good faith relied upon such representation; and (3) that relying upon such representation such third person has changed his position to his detriment.").

78.    *Amstar Ins. Co. v. Cadet*, 862 So. 2d 736, 741 (Fla. 5th DCA 2003); *Roessler v. Novak*, 858 So. 2d 1158, 1161-62 (Fla. 2d DCA 2003); *Ramos v. Preferred Medical Plan, Inc.,* 842 So. 2d 1006, 1008 (Fla. 3d DCA 2003); *Carolina-Georgia Carpet & Textiles, Inc. v. Pelloni*, 370 So. 2d 450, 451 (Fla. 4th DCA 1979).

79.    *See Knighten v. Palisades Collections, LLC*, 721 F. Supp. 2d 1261, 1267 (S.D. Fla. 2010). The Court recognized this is the principal issue here as well.  *See* Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 57 (The Court: "The real issue relates to David Siegel and what he's done. So you ought to focus on that.").

80.    *Roessler*, 858 So. 2d at 1162.

does. Therefore, any belief that Greenfield had about Richard Siegel's authority as a result of Richard's actions is simply not probative in an apparent agency analysis.

In *National Auto Lenders, Inc. v. Syslocate, Inc.*,[81] the Southern District of Florida denied a motion to compel arbitration because it found that the agreement was signed by individuals who did not have authority to bind the plaintiff to arbitration, and that despite their own actions which may superficially have created an appearance of apparent authority, it was only the actions of the actual principal that could create such apparent authority.[82]  As a result, the Court held that no agreement to arbitrate existed, even though the signatories to the agreement – **in stark contrast to Richard Siegel's words and conduct here** – actually told the defendant that they had the authority to bind the principal.  The Court reiterated that: "[t]he reliance of a third party on the apparent authority of the principal's agent must be reasonable and *rest in the actions of or appearances created by the principal* ... and not by agents who often ingeniously create an appearance of authority by their own acts." (*e.s.*)[83]

What the Court found missing in *National Auto Lenders* is likewise missing here. Greenfield admitted that David Siegel, for himself and for Westgate, never told her or even made the slightest intimation that Richard Siegel had any authority to sign contracts for Westgate Resorts, Ltd., much less a contract that purports to release legal claims that had not, to the knowledge of David Siegel (since he had not then seen the film), even arisen as of November, 2011.  As such, Defendants cannot claim they "thought" Richard Siegel was Westgate Resorts, Ltd.'s agent, as, according to Greenfield herself, no-one had ever suggested that such was the case. More importantly, Defendants cannot portray the actions of Richard Siegel – especially

---

81.   686 F.Supp.2d 1318 (S.D. Fla.).
82.   *See National Auto Lenders, Inc.*, at 1322.
83.   *Id.*

those attributed to him by others in materials Greenfield had not at the time even seen and which, in any event, are no more than rank hearsay – as something upon which they relied to impute the "apparent authority", as, first, Greenfield's testimony refutes this, and second, and most importantly, that authority may only come from the words and actions of David Siegel as principal, and that never occurred. Finally, there can be no ratification of Richard Siegel's signing of the Release because David Siegel never learned about it until this litigation began and the Motion to Stay was filed, after which everything both Westgate Resorts, Ltd. and David Siegel have done has been antithetical to the notion that the execution of the Release was ratified.[84] Greenfield certainly had the opportunity to do so, as she visited David Siegel a few days after Richard Siegel signed the Release, but never mentioned it to David Siegel at all.[85]

## III.    CONCLUSION

Westgate Resorts, Ltd. made no agreement to arbitrate with the Defendants. Richard Siegel, the only signatory on the Release, was not an authorized agent of Westgate Resorts, Ltd. and did not have apparent authority to bind Westgate Resorts, Ltd. to the terms of the Release. The only way that such authority could be imputed to Richard Siegel is through the express or implied consent of the principal and the person Greenfield knew spoke for his companies, David Siegel. Greenfield could not have assumed that Richard Siegel had any authority based upon the actions of Richard Siegel or based upon her own understanding of the hierarchy of Westgate. Instead, Greenfield must be able to point to some action by David Siegel himself to create this authority—and she simply cannot do so. Greenfield acknowledged and agreed that she never once discussed a release for Westgate Resorts with the one person who she knew from 2009

---

84.    Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", p. 228.
85.    Deposition of Lauren Greenfield, attached hereto as Exhibit "B", pp.27-28; Transcript of Evidentiary Hearing [DE 75] attached hereto as Exhibit "A", pp. 214-15.

exerted near dictatorial control over the company: David Siegel. Because of this, Greenfield could not have reasonably believed that Richard Siegel had the apparent authority to bind Westgate and as a result this Court must find that the Release is not binding as to Westgate.

Respectfully submitted this 15th day of December, 2012.

*/s/ Richard W. Epstein*
RICHARD W. EPSTEIN, ESQ.
Florida Bar No. 229091
Richard.Epstein@gmlaw.com
REBECCA F. BRATTER, ESQ.
Florida Bar No. 685100
Rebecca.Bratter@gmlaw.com
MARY B.CLARK, ESQ
Florida Bar No. 30178
Mary.Clark@gmlaw.com
GREENSPOON MARDER, P.A.
200 East Broward Boulevard, Suite 1500
Fort Lauderdale, Florida 33301
Telephone No. (954) 491-1120
Facsimile No. (954) 343-6958

MICHAEL MARDER, ESQ.
Florida Bar No. 251887
Michael.Marder@gmlaw.com
KATHRYN SAFT, ESQ.
Florida Bar No. 041069
Kate.Saft@gmlaw.com
GREENSPOON MARDER, P.A.
Capital Plaza I
201 East Pine Street, Suite 500
Orlando, Florida 32801
Telephone No. (407) 425-6559
Facsimile No. (407) 422-6583

*Attorneys for Westgate Resorts, Ltd.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using CM/ECF service which will provide copies to all

23

counsel of record registered to receive CM/ECF notification per service list attached on this

15th day of December, 2012.

/s/ Richard W. Epstein
RICHARD W. EPSTEIN