

10850 Wilshire Boulevard / 9th Floor
Los Angeles, CA 90024-4321
310-446-1000 TEL / 310-446-1600 FAX
www.ifta-online.org / info@ifta-online.org

March 13, 2014

Michael Marder, Esq.
Kathryn Saft, Esq.
Greenspoon Marder, P.A.
Capital Plaza I
201 E. Pine Street, Suite 500
Orlando, FL  32801
    Via email:  michael.marder@gmlaw.com; kate.saft@gmlaw.com and certified mail

Richard W. Epstein, Esq.
Greenspoon Marder, P.A.
200 E. Broward Boulevard, Suite 1500
Fort Lauderdale, FL  33301
    Via email:  richard.epstein@gmlaw.com and certified mail

Martin Garbus, Esq.
Joseph Johnson, Esq.
Eaton & Van Winkle LLP
3 Park Avenue, 16th Floor
New York, NY  10016
    Via email:  mgarbus@evw.com; jjohnson@evw.com and certified mail

**Re:    Arbitration #13-25 – Westgate Resorts, Ltd. v. Lauren Greenfield, Frank Evers and Greenfield/Evers, LLC**

Gentlepersons:

In accordance with Paragraph 12.3 of the applicable IFTA Rules for International Arbitration, enclosed is a fully executed Award of Arbitrator rendered in this matter.

This Award is being forwarded to the Parties via email, with an original to follow via USPS certified and/or registered airmail.  If you would like to receive the Award via courier, please provide IFTA with your courier account number no later than close of business day from the date of this letter.

Sincerely,
IFTA

*Richonda Starkey*
Richonda Starkey
Arbitral Agent

Michael Marder, Esq.
Kathryn Saft, Esq.
Richard W. Epstein, Esq.
Martin Garbus, Esq.
Joseph Johnson, Esq.
March 13, 2014
Page 2

enclosures by certified mail

cc:  Roy G. Rifkin, Esq., Arbitrator – 310-479-1422 w/o attachments
 Kim Meltzer, Deputy General Counsel, IFTA
 Susan Cleary, Vice President & General Counsel, IFTA

## DECLARATION OF SERVICE

I, Richonda Starkey, declare as follows:

I act as Arbitral Agent for IFTA Arbitration in Los Angeles, California. I am over the age of eighteen years of age and am not a party to this action. IFTA's address is 10850 Wilshire Boulevard, 9th Floor, Los Angeles, CA 90024. On March 13, 2014, I served the **Award of Arbitrator** on the interested parties as follows:

☐ **BY REGISTERED AND/OR CERTIFIED MAIL:** I placed a true copy in a sealed envelope addressed the party/ies indicated at the address(es) below. The envelope is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party serviced, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day after date of deposit for mailing in affidavit.

☐ **BY COURIER/OVERNIGHT SERVICE:** I caused DHL Express or Federal Express to deliver a true copy of the aforementioned document(s) in a sealed envelope with airbill addressed to the party/ies indicated at the address(es) shown below.

☐ **BY FACSIMILE:** I caused the aforementioned document to be transmitted by facsimile machine to the parties and numbers indicated below. The transmissions were reported as complete, and no errors were reported by the facsimile machine. Copies of the transmission records are maintained by our office.

☐ **BY PERSONAL SERVICE**: I caused Express Group, Inc. to hand deliver a true copy of the aforementioned document(s) in a sealed envelope addressed to each person(s) named at the address(es) shown below.

☒ **BY ELECTRONIC MAIL (.PDF FORMAT):** I caused a true copy of the aforementioned document(s) to be sent via e-mail (.pdf format) to the interested party/ies at the e-mail address/es indicated below.

Executed on March 13, 2014 at Los Angeles, California.

☒ **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

*Richonda Starkey*
**RICHONDA STARKEY**
**Arbitral Agent**
**IFTA Arbitration**

## SERVICE LIST

**IFTA Arbitration #13-25**
**Westgate Resorts, Ltd. v. Lauren Greenfield, Frank Evers and Greenfield/Evers, LLC**

Michael Marder, Esq.
Kathryn Saft, Esq.
Greenspoon Marder, P.A.
Capital Plaza I
201 E. Pine Street, Suite 500
Orlando, FL 32801

michael.marder@gmlaw.com
kate.saft@gmlaw.com


Richard W. Epstein, Esq.
Greenspoon Marder, P.A.
200 E. Broward Boulevard, Suite 1500
Fort Lauderdale, FL 33301

richard.epstein@gmlaw.com


Martin Garbus, Esq.
Joseph Johnson, Esq.
Eaton & Van Winkle LLP
3 Park Avenue, 16th Floor
New York, NY 10016

mgarbus@evw.com
jjohnson@evw.com

# INDEPENDENT FILM & TELEVISION ALLIANCE

## INTERNATIONAL ARBITRATION TRIBUNAL

In the matter of the Arbitration between

WESTGATE RESORTS, LTD.,

Claimant/Counter-Respondent,

and

LAUREN GREENFIELD, FRANK EVERS, and GREENFIELD/EVERS, LLC,

Respondents/Counter-Claimants.

IFTA Arbitration No.   13-25

**AWARD OF ARBITRATOR**

This matter was heard on July 15, 16, 17 and 18, 2013, and submitted for decision upon the filing of post-hearing briefs on January 27, 2014. Roy G. Rifkin, Esq. was duly appointed as Arbitrator pursuant to the agreement to arbitrate contained in the release document dated November 26, 2011. The matter was ordered to arbitration by order of the United States District Court for the Middle District of Florida, dated January 24, 2013.

Michael E. Marder, Esq.; Richard W. Epstein, Esq.; and Kathryn Saft, Esq. (by teleconference) of Greenspoon Marder appeared as counsel for claimant/counter-respondent Westgate Resorts, Ltd. ("Westgate"). Martin Garbus, Esq. and Joseph T. Johnson, Esq. of Eaton & Van Winkle LLP appeared as counsel for respondents/counter-claimants Greenfield/Evers, LLC; Lauren Greenfield; and Frank Evers.

1

The Arbitrator, having considered the evidence and arguments submitted, makes the following Award:

## FACTS

This arbitration involves the filming and release of a documentary motion picture entitled *The Queen of Versailles* (the "Motion Picture"). The director of the Motion Picture was respondent/counter-claimant Lauren Greenfield ("Greenfield"). The original concept of the Motion Picture, which began filming in 2009, was to document the lives of David Siegel ("David") and his wife Jacqueline Siegel ("Jackie") (sometimes referred to collectively as the "Siegels") and their family including, in particular, their construction of a 90,000 square foot home in Florida, the largest home in America, to be known as "Versailles." David is the founder and CEO of Westgate, one of the largest privately-owned timeshare companies in the world.

At the time filming of the Motion Picture commenced, Westgate was in the process of opening the PH Towers by Westgate, a high rise timeshare property in Las Vegas, viewed within Westgate and by the Siegels as the crown jewel of Westgate's business. During the course of filming, however, the global economic crisis resulted in Westgate having issues with its lenders on the PH Towers and problems financing the continuing construction of Versailles. Consequently, the focus of the film shifted somewhat from the construction of the largest home in America to Westgate facing the economic challenges relating to PH Towers and the Siegel family facing their personal economic challenges.

Filming of the Motion Picture concluded in or about November 2011, and the Motion Picture was first exhibited at the Sundance Film Festival in early 2012. By that time, Westgate had reluctantly sold its controlling interest in PH Towers to Resorts Finance America, with the Siegels incurring a substantial financial loss as a result.

2

Notwithstanding the adverse financial impact of the PH Towers project, Westgate as a whole has thrived since the sale of PH Towers and the release of the Motion Picture. Additionally, the Siegels avoided losing Versailles to foreclosure and resumed with construction of the largest home in America.

PROCEDURAL HISTORY

Apart from this arbitration itself, there have been two other related proceedings of significance. On January 10, 2012, Westgate filed an action in the United States District Court for the Middle District of Florida against all of the respondents herein ("Florida Federal Action"). In the Florida Federal Action, Westgate asserted claims for defamation that were essentially the same claims it asserts in this arbitration, which will be described in greater detail below.

After considerable legal activity, on January 24, 2013, that court, the Honorable Chief Judge Anne C. Conway presiding, issued an order staying the Florida Federal Action and compelling arbitration. The court concluded that an agreement to arbitrate the claims between the parties in that action exists as part of that certain release document (referred to in the order and hereinbelow as the "November Release") executed November 26, 2011, by Richard Siegel, David's son and vice president of Westgate. The instant arbitration was then commenced by Westgate pursuant to the Notice of Arbitration dated Februrary 26, 2013.

The second proceeding of relevance was an action filed by Westgate in June 12, 2013, in the United States District Court for the Central District of California naming as defendants all of the respondents herein as well as the Independent Film & Television Alliance ("IFTA"). In that action ("California Federal Action") Westgate sought to enjoin or stay the instant arbitration.

3

After an initial flurry of legal activity, the California Federal Action was voluntarily dismissed by Westgate on July 5, 2013.

## CLAIMS

Westgate's claim is for defamation in two particulars – first in connection with the Motion Picture itself, which Westgate claims is defamatory in that it falsely depicted Westgate as (a) failing to pay its bills to the contractor that built PH Towers; (b) being compelled to lay off its work force; and (c) essentially being broke and out of business, on the verge of bankruptcy. Secondly, Westgate claims defamation in connection with a press release from Sundance (the "Sundance Press Release") that contained the following statements describing the Motion Picture:

"(a) The timeshare tycoon and his socialite wife are forced to sell off the unfinished property or face economic ruin;

"(b) Their timeshare "empire" collapses;

"(c) Their house is foreclosed; and

"(d) Rags-to-riches-to-rags story."

Respondents' counterclaim is for attorney's fees and costs incurred in defense of the instant arbitration as well as those incurred prior thereto in connection with the dispute of the parties. The counterclaim is superfluous to respondents' prayer for attorney's fees and costs in answer to the Notice of Arbitration. Therefore, the claims set forth by way of the counterclaim will be addressed below as simply part of the answer.

4

## DISCUSSION

Westgate's Defamation Claims

The tort of defamation involves (a) a publication that is (b) false, (c) defamatory, (d) unprivileged, and (e) has a natural tendency to injure or that causes special damage. California Civil Code § 45[1]. Because defamation is an intentional tort, the defendant must have intended the publication. Witkin, *Summary of California Law*, 10th Edition, § 529. To satisfy the element of publication, the defamatory matter must be communicated to some third person who understands its defamatory meaning and application to the plaintiff. *Ringler Associates v. Maryland Cas. Co.*, 80 Cal.App.4th 1165, 1179 (2000). Finally, where one may be characterized as a public figure or limited public figure, defamation lies only where the statement was made with malice. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350-352 (1974); *McGarry v. University of San Diego*, 154 Cal.App.4th 97, 113-115 (2007). Malice in defamation cases means actual or express malice, hatred or ill will, and not the fictional malice implied by law from the intentional doing of a wrongful act without just cause. *Frommoethelydo v. Fire Insurance Exchange*, 42 Cal.3d 208, 228 (1986).

Westgate has not proven a case for defamation. Addressing first the Motion Picture itself, the Arbitrator, having viewed the supposedly egregious portions of the Motion Picture numerous times, simply does not find that any of the content of the Motion Picture was false. *See Summit Bank v. Rogers*, 206 Cal.App.4th 669, 696 (2012) (it is for the trier of fact to determine whether or not a statement is to be understood as a defamatory falsehood). There is nothing taken away by the viewer of the Motion Picture that is inconsistent with the fundamental reality that the global recession created a crisis for Westgate causing it to have to reluctantly give

---

[1] Under Rule 13.1 of the IFTA Rules for International Arbitration, the laws of the State of California apply.

up its interest in PH Towers. To a great extent this is derived from the words of David, Jackie, and Richard Siegel themselves. Perhaps the clearest example of this is David referring to the story being told as a "rags-to-riches-to-rags story."[2] Moreover, Westgate failed to establish that it was damaged by any of the content of the Motion Picture. There was some testimony to the effect that a few potential customers commented on the film, but no specific evidence of lost business. In fact, as noted above, Westgate's business has apparently thrived as never before since the release of the Motion Picture.

Addressing the Sundance Press Release, even assuming the content thereof to be false and defamatory (which is debatable), a claim of defamation is not made out for a number of reasons including (a) the fact that respondents were not responsible for its creation, (b) were initially unaware of its presence on their website, and (c) immediately took reasonable steps to remove and/or modify it on their website when they did become so aware. Additionally, there was no evidence that the purportedly defamatory matter was communicated by respondents to any third person who understood the defamatory meaning and application to the claimant. *Ringer Associates, supra*. Finally, there was no damage whatsoever alleged or proven in connection with the appearance of the Sundance Press Release on respondents' internet site.[3]

As to both the Motion Picture and the Sundance Press Release, the evidence did not remotely establish the type of malice required for a defamation claim on behalf of a public figure. The malice required under the law cannot be inferred from the mere fact that respondents

---

[2] It is difficult to overlook the fact that Jackie and, to a lesser extent, David, have actively promoted the Motion Picture, including on Jackie's personal internet site, since the release of the Motion Picture. This is inconsistent with the contention that Westgate is depicted in the Motion Picture in a false and defamatory light.

[3] Even if Westgate had made out an actionable claim for defamation, which it did not, it would not be entitled to an award of punitive damages in this arbitration. IFTA Rules for International Arbitration Rule 8.4.

6

refused to meet Westgate's demands to make changes to the Motion Picture to meet the wishes of Westgate and the Siegels nor from any other facts or circumstances established in the arbitration.[4]

Respondents' Claim for Attorney's Fees

The arbitration provision contained in the November Release pursuant to which the Federal Court in Florida ordered this matter to arbitration reads as follows:

> "All disputes under this Release shall be settled pursuant to binding arbitration under the rules of the Independent Film and Television Alliance ("IFTA"). The prevailing party will be entitled to reasonable attorney fees and costs."

Respondents are the prevailing party in this arbitration. Claimant makes numerous arguments as to why respondents are not entitled to recover reasonable attorney's fees and costs. None of those arguments are persuasive. Respondents clearly have standing to recover fees as the prevailing party. The fact that some or all of the defense in this case was covered by respondents' errors and omissions insurance is not relevant. *See Nemecek & Cole v. Horn*, 208 Cal.App.4th 641 (2012); *Staples v. Hoefke*, 189 Cal.App.3d 1397 (1987).

Claimant argues that the attorney's fee provision does not apply under the case of *Gil v. Mansano*, 121 Cal.App.4th 739 (2004). That argument is also without merit. The fee provision in *Gil* was far more limited than the one here. In that case, the fee provision applied only to an action "brought to enforce the release" at issue there. Claimant argues that the instant arbitration was not brought "under the Release" so the fee provision does not apply. However, that issue has already been adjudicated by the Federal Court in Florida. In staying the Florida Federal Action and ordering the case to arbitration, the court in Florida necessarily concluded that the

---

[4] Having concluded that there is no defamation for the reasons set forth above, it is unnecessary to address a number of other issues raised, such as the defense of statute of limitations and the defense that the claim is barred by the language of the November Release.

7

November Release contained an enforceable agreement to arbitrate these very claims for defamation – i.e., that the defamation claims are "disputes under [the] Release." That result will not be disturbed here. Thus, the attorney's fee provision applies.

The precise amount of respondents' claim for attorney's fees is something of a moving target, apparently exceeding many times over the amount paid to counsel by respondents' insurance carrier. The services which are the subject of the claim include those of multiple law firms, multiple attorneys and staff within those firms, and multiple forums, including not just the instant arbitration but the Florida Federal Action and California Federal Action as well.

To a certain extent, respondents are correct when they assert that claimant's tenacious prosecution of its defamation claims greatly increased the legal effort necessary to defend. *Ketchum v. Moses*, 24 Cal.4th 1122, 1141 (2001).[5] There is no better example of this than the two collateral federal actions filed by claimant which generated substantial legal activity but did nothing to advance the adjudication of the claims themselves. Claimant's argument to the contrary, there is no question that it is proper to include in a fee award amount expended in defense of both federal actions filed by claimant. However, that does not mean that a fee award should be made to punish the losing party. *Id.* at 1139.

Even under the premise that the fee recovery is not limited to the amount reimbursed by insurance (*Nemecek & Cole, supra*), respondents' claim of well over $1,000,000 for "reasonable attorney's fees" is problematic for several reasons. For example, the claim for fees purportedly incurred by the Lichter Grossman firm, in the approximate amount of $45,000, is not supported by any contemporaneous time records. The hourly rates claimed in general, blending to a rate in excess of $600 per hour, are not sufficiently substantiated and appear to be well outside the range

---

[5] Certainly the parties were "tenacious" in the prosecution and defense of this arbitration. The post-hearing briefs alone exceeded a hundred pages for each side.

8

provided for in the Laffey Matrix. Additionally, even a cursory examination of the time records submitted by respondents' counsel calls into question the reasonableness of some of the fees claimed.[6]

Additionally, substantial amounts of attorney time spent in connection with certain legal and factual arguments are not reasonable. For example, respondents devoted an inordinate number of pages in their briefs to California's anti-SLAPP law. Although the general philosophy behind that law might have been worth mentioning, neither the specific procedure under California Code of Civil Procedure § 425.16 nor the substantive specifics of anti-SLAPP law is controlling as no anti-SLAPP motion was ever brought. The effort in arguing anti-SLAPP is highly disproportional to the relevance of such arguments to the arbitration. Therefore, the fees incurred in connection with such arguments are not reasonable.

Finally, some of respondents' efforts involve highly questionable tactics. Portions of the testimony of attorney Martin Garbus, purportedly in support of the attorney's fee claim, are inappropriate on many levels. *See* Garbus Affidavit dated November 13, 2013, ¶¶ 43-45. Respondents improperly attempted to proffer evidence after the close of the hearing. The purported evidence proffered is a newspaper article that is not competent evidence of anything at all, let alone any issue relevant to the dispute at hand, and is highly inflammatory. Such tactics are not reasonable. It is impossible to determine precisely how much of the fees claimed by respondents were incurred as part of such inappropriate efforts to put before the Arbitrator inadmissible and prejudicial testimony and evidence (at least in part because of the lack of sufficient description in the billing records of respondents' counsel), but it is apparent that the amount is not insignificant. Respondents will not be compensated for such efforts. *See Frog*

---

[6] *See* July 22, 2013, entry for attorney Martin Garbus for 20.50 hours for "Case Administration/telephone conference with M. Lorentz; emails to client and report to carrier."

9

*Creek Partners, LLC v. Vance Brown, Inc.*, 206 Cal.App.4th 515, 547 (2012) (trial court has discretion to exclude from fee award fees incurred by a prevailing party in making frivolous procedural maneuvers).

Under Rule 14 of the IFTA Rules for International Arbitration, the Arbitrator has discretion in allocating fees and costs. The discretion in determining the amount of fees to be awarded is broad. *See PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1095 (2000); *Glendora Community Redevelopment Agency v. Demeter*, 155 Cal.App.3d 465, 474-5 (1984). In consideration of the matters described above, an award to respondents of attorney's fees in the amount of $750,000 is appropriate.[7]

Pursuant to Rule 14.2, the general principle to be applied is that the parties shall bear equally the costs, including the fees of the Arbitrator, incurred in the arbitration. Consistent with this philosophy, the Arbitrator rules that the costs of arbitration shall be borne by the parties as incurred.

---

[7] A final note: Claimant neither proffered evidence nor argued that the time spent and/or the rates charged by respondents' counsel were out of line with claimant's own fees in connection with these very same proceedings, something that the Arbitrator might expect when a party contends that fees claimed by the opposition are not reasonable. It can only be inferred from this that the time billed and the rates charged by claimant's counsel were greater than what claimant would like the Arbitrator to believe.

## AWARD

1. Claimant shall take nothing by its claims against respondents.

2. Claimant shall pay to respondents the sum of $750,000 for attorney's fees.

3. All administrative fees of the Independent Film & Television Alliance, fees of the Arbitrator, and other costs shall be borne as incurred by the parties.

DATED:  March 12, 2014

ROY G. RIFKIN
Arbitrator
11400 W. Olympic Blvd., Ninth Floor
Los Angeles, CA  90064-1582
Telephone:  (310) 478-4100
Facsimile:  (310) 479-1422
Email:  rrifkin@wrslawyers.com

11